892 F.2d 1512
 13 U.S.P.Q.2d 1808
 HOWARD JOHNSON COMPANY, INC., Howard Johnson Franchise
Systems, Inc., Howard Johnson Restaurant
Franchise, Inc., Plaintiffs-Appellees,
v.
Amir KHIMANI, Maralak, Ltd., Torbay Holding, Inc.,
Defendants-Appellants.
 No. 87-3874.
 United States Court of Appeals,
Eleventh Circuit.
 Jan. 29, 1990.
 
 David L. Evans, Ava K. Doppelt, Herbert L. Allen, Neal J. Blaher, Orlando, Fla., for defendants-appellants.
 Frank R. Jakes, Tampa, Fla., for plaintiffs-appellees.
 Appeal from the United States District Court for the Middle District of Florida.
 Before KRAVITCH, Circuit Judge, HENDERSON and HILL, Senior Circuit Judges.*
 KRAVITCH, Circuit Judge:
 
 
 1
 Defendants Torbay Holding, Inc. (Torbay), its wholly owned subsidiary Maralak, Ltd., and its principal shareholder Amir Khimani (referred to collectively as Maralak), appeal the district court's finding of civil contempt and imposition of sanctions in a trademark infringement action brought by plaintiffs Howard Johnson Co., Inc., Howard Johnson Franchise Systems, Inc., and Howard Johnson Restaurant Franchises, Inc. (referred to collectively as Howard Johnson). Because we conclude that the district court did not abuse its discretion in holding the defendants in civil contempt and imposing sanctions, we affirm.
 
 FACTS
 
 2
 On February 6, 1984, Maralak and Howard Johnson entered into a franchise agreement respecting the operation of three Howard Johnson motor lodges and restaurants in St. Petersburg, Cocoa, and Melbourne, Florida. After the expiration of the agreement on February 6, 1986, the defendants continued to hold out these properties as authorized Howard Johnson franchises. On July 25, 1986, Howard Johnson filed the present trademark infringement suit and sought a preliminary injunction to halt Maralak's conduct. On August 4, 1986, the court granted Howard Johnson's motion and enjoined the defendants from using the words "HOWARD JOHNSON" or "HOWARD JOHNSON'S" or the Howard Johnson quality stripe design service mark or the orange roof and blue cupola design service mark, or "any colorable imitations of these trade names and federally-registered servicemarks" in connection with the operation, promotion, and sale of services of defendants' St. Petersburg, Cocoa, and Melbourne, Florida motor lodges and restaurants. Additionally, the defendants were prohibited from engaging in any advertising or sales practices that in any way diluted or disparaged these service marks and trade names. The district court's preliminary injunction was subsequently affirmed by this court. Howard Johnson Co. v. Khimani, 819 F.2d 1148 (11th Cir.1987) (mem.).
 
 
 3
 The defendants' efforts at compliance were dilatory and grudging. At least through August 17, 1986, the defendants' facilities continued to hold themselves out to the public as Howard Johnson franchises. All of the exterior signs identified the facilities as Howard Johnson motor lodges and restaurants and the buildings each had the distinctive Howard Johnson orange roof and blue cupola. The lobbies, restaurants, and guest rooms were all replete with articles bearing the Howard Johnson logo. Additionally, the personnel at these locations continued to refer to their facilities as Howard Johnson when speaking to patrons. Substantial compliance was not achieved until the eve of a September 5, 1986, contempt hearing.
 
 
 4
 Howard Johnson filed a second motion for contempt on November 6, 1986, after it discovered that the plastic coverings used by the defendants to block out the signs at the Melbourne and Cocoa locations had blown off and had not been replaced. The plaintiffs also noticed that two billboards advertising the Cocoa facility still retained the orange "roofline" logo of Howard Johnson. The trial court denied the plaintiffs' motion for contempt after the defendants removed the signs and obscured the "roofline" logo from the billboards three days prior to the second contempt hearing.
 
 
 5
 The third motion for contempt, which is the subject of this appeal, was filed by Howard Johnson on April 21, 1987, after discovering that the defendants had begun operating their Cocoa and Melbourne motor lodges and restaurants under the name "H.J. Inns." The trial court had testimony from Azim Visram, the general manager of the Cocoa and Melbourne facilities, concerning a November 1986 meeting between Visram, Khimani, and Khimani's son Ariff, who was president of defendant Torbay Holding.[1] Visram testified that at this meeting, "it was decided that we would get a name that would be close to Howard Johnson's name, yet it would not infringe on their name...." Visram later affirmed that "the idea was to get as close to Howard Johnson as you could without infringing." Visram testified that during or shortly after this meeting, the Khimanis, with the final approval of defendant Amir Khimani, decided to rename the facilities "H.J. Inns."
 
 
 6
 Pursuant to Amir Khimani's decision to rename the facilities, "H.J. Inns" was painted in white lettering against a dark blue background on the former Howard Johnson sign at the Cocoa lodge. Previously, the sign had displayed "HOWARD JOHNSON'S" in white letters on a light blue background. The name "H.J. Inns" was also placed with removable black plastic letters on the marquee sign at the Melbourne lodge. Additionally, the employees at both locations answered their phones and identified the facilities to the public as "H.J. Inns."
 
 
 7
 The trial court found that the defendants' operation of the Melbourne and Cocoa facilities under the name "H.J. Inns" and the "H.J. Inns" signs constituted a violation of the court's preliminary injunction. It therefore granted the plaintiffs' third motion for civil contempt and, in a subsequent hearing, imposed compensatory damages, costs, and attorneys' fees in the amount of $234,475.15. On appeal, the defendants challenge both the district court's finding of contempt and the amount of sanctions.
 
 JURISDICTION
 
 8
 As a preliminary matter, the appellees assert that this court lacks jurisdiction to hear Maralak's appeal because it is allegedly based upon a non-final interlocutory order of civil contempt. Appellees rely on the Supreme Court's holding in Fox v. Capital Co., "that except in connection with an appeal from a final judgment or decree, a party to a suit may not review upon appeal an order fining or imprisoning him for the commission of a civil contempt." 299 U.S. 105, 107, 57 S.Ct. 57, 58, 81 L.Ed. 67 (1936); see Doyle v. London Guarantee & Accident Co., 204 U.S. 599, 27 S.Ct. 313, 314, 51 L.Ed. 641 (1907); Rosenfeldt v. Comprehensive Accounting Service Corp., 514 F.2d 607, 613 n. 9 (7th Cir.1975).
 
 
 9
 Appellees are correct that a finding of civil contempt is generally not reviewable on interlocutory appeal. Fox, 299 U.S. at 107, 57 S.Ct. at 58; Combs v. Ryan's Coal Co., 785 F.2d 970, 976 (11th Cir.), cert. denied, 479 U.S. 853, 107 S.Ct. 187, 93 L.Ed.2d 120 (1986). However, there are several exceptions to this principle. Most significant is the distinction this court has drawn
 
 
 10
 between orders imposing a fine or penalty for contempt which may be avoided by the party purging himself of the contempt by complying with the order, and those in which a fine or penalty is imposed within a time certain that may not be avoided by some other form of compliance. The former is not appealable in an interlocutory action; the latter may be taken on appeal immediately.
 
 
 11
 Combs, 785 F.2d at 976; Drummond Co. v. District 20, United Mine Workers of America, 598 F.2d 381, 384 (5th Cir.1979).[2] If the contempt penalties imposed are conditional or subject to modification, then they are not reviewable on appeal. Combs, 785 F.2d at 976; Drummond, 598 F.2d at 384.
 
 
 12
 The final judgment of civil contempt entered by the district court on November 27, 1987, and incorporating the previous orders for contempt, sanctions, and fees is a final, non-conditional judgment ripe for immediate appeal. There is no contingency or condition which could permit the appellants to modify or purge themselves of the sanctions imposed by the judgment of contempt. Regardless of the outcome of the underlying trademark infringement case, the defendants will be bound by the contempt judgment. Because this appeal is the defendants' only opportunity to alter their obligations under the judgment of contempt, it has the requisite finality for appellate review.
 
 FINDING OF CONTEMPT
 
 13
 In a civil contempt proceeding, the petitioning party bears the burden of establishing by "clear and convincing" proof that the underlying order was violated. Newman v. Graddick, 740 F.2d 1513, 1525 (11th Cir.1984); Piambino v. Bestline Products, Inc., 645 F.Supp. 1210, 1213 (S.D.Fla.1986). However, once the moving party makes a prima facie showing that the court order was violated, the burden of production shifts to the alleged contemnor to show a "present inability to comply that goes 'beyond a mere assertion of inability....' " Combs, 785 F.2d at 984 (quoting United States v. Hayes, 722 F.2d 723, 725 (11th Cir.1984); see United States v. McAnlis, 721 F.2d 334, 337 (11th Cir.1983), cert. denied, 467 U.S. 1227, 104 S.Ct. 2681, 81 L.Ed.2d 877 (1984). Therefore, the focus of the court's inquiry in civil contempt proceedings is not on the subjective beliefs or intent of the alleged contemnors in complying with the order, but whether in fact their conduct complied with the order at issue. Jim Walter Resources, Inc. v. Int'l Union, United Mine Workers of America, 609 F.2d 165, 168 (5th Cir.1980). Conduct that evinces substantial, but not complete, compliance with the court order may be excused if it was made as part of a good faith effort at compliance. Newman, 740 F.2d at 1524.
 
 
 14
 The district court's judgment of civil contempt will be affirmed unless we find that the court abused its discretion. Afro-American Patrolmen's League v. City of Atlanta, 817 F.2d 719, 723 (11th Cir.1987); Sizzler Family Steak Houses v. Western Sizzlin' Steak House, Inc., 793 F.2d 1529, 1534 n. 4 (11th Cir.1986). Thus, if the evidence is such that a reasonable person could find a clear and convincing violation of the preliminary injunction, we must affirm the contempt ruling of the district court. See Deitchman v. E.R. Squibb & Sons, 740 F.2d 556, 563-64 (7th Cir.1984).
 
 
 15
 Maralak contends that the court abused its discretion in finding it in civil contempt for violating the preliminary injunction because the court lacked sufficient facts upon which to base a decision, the name "H.J. Inns" was not a colorable imitation of any Howard Johnson trade or service marks, and, in any event, it was not responsible for the violative behavior. The district court properly rejected these arguments.
 
 
 16
 The district court's preliminary injunction prohibited the defendants from using "any colorable imitation" or otherwise diluting the Howard Johnson trade name or service marks in connection with the operation of the St. Petersburg, Cocoa, and Melbourne, Florida facilities. The record before the court provided an ample basis for finding the defendants' conduct violative of the injunction by clear and convincing evidence. Specifically, the court had photographic evidence of the H.J. Inns signs at the Cocoa and Melbourne lodges and the old Howard Johnson signs that they replaced. The Cocoa H.J. Inns sign was painted in the same color lettering against a similarly colored background on the same sign that had once said "Howard Johnson's." Although the Melbourne sign was not visually similar to the previous Howard Johnson sign, the name itself is similar enough to "Howard Johnson" that a reasonable person could find it to be a colorable imitation. Cf. Holiday Inns v. Alberding, 683 F.2d 931, 932-33 & n. 1 (5th Cir.1982) (defendant's sign, retaining color and shape of former franchise sign, essentially identical to former sign despite name change from "Holiday Inn" to "Holiday Hotel"); see also Jellibeans, Inc. v. Skating Clubs of Georgia, Inc., 716 F.2d 833, 842 (11th Cir.1983) (roller skating rink name "Lollipops visually similar to Jellibeans" because each is a similar sounding candy name used to designate a roller rink); G. Heileman Brewing Co. v. Anheuser-Busch, Inc., 873 F.2d 985, 994 (7th Cir.1989) (initials, in the trademark context, do not differ significantly from the words they represent). This interpretation is supported by evidence that Howard Johnson uses the "HJ" mark at several motor lodges in Florida and that it has a federally registered "HJH" service mark for hotel services.
 
 
 17
 The court's finding that "H.J. Inns" was a colorable imitation of or diluted Howard Johnson trade and service marks is strengthened by the fact that the consuming public was likely to confuse the two marks because they created the same general impression and had been used in the same context. See Jellibeans, 716 F.2d at 842; Holiday Inns, 683 F.2d at 933; Hart Schaffner & Marx v. Alexander's Department Stores, 341 F.2d 101, 102 (2d Cir.1965). Aside from the intrinsic similarity of the names and design, the same facilities with the same signs had previously operated as Howard Johnson franchises, thereby greatly increasing the possibility that consumers would interpret "H.J. Inns" as designating a Howard Johnson establishment. See, e.g., Holiday Inns v. Airport Holiday Corp., 493 F.Supp. 1025, 1028 (N.D.Tex.1980), aff'd sub nom Holiday Inn v. Alberding, 683 F.2d 931 (5th Cir.1982) (considering whether former franchise's imitation of hotel name misled and lured potential franchise patrons).[3] The danger of such confusion was exacerbated by the existence during the period of contempt of a Howard Johnson advertising campaign having the theme "We're turning Howard Johnson upside down." Customers who were aware of these advertisements could perceive the slight alteration in name as consistent with the theme of making substantial changes in the operation of the franchise.
 
 
 18
 Furthermore, the legal posture of this case places a heavier burden upon the defendants of avoiding a colorable imitation of or diluting Howard Johnson trade and service marks than upon a party not already preliminarily enjoined from engaging in such activity. The former Fifth Circuit explained that
 
 
 19
 where the appellants have been found guilty of infringing the trade-mark rights of others, they should thereafter be required to keep a safe distance away from the dividing line between violation of, and compliance with, the injunction. They must do more than see how close they can come with safety to that which they are enjoined from doing.
 
 
 20
 Eskay Drugs v. Smith, Kline & French Laboratories, 188 F.2d 430, 432 (5th Cir.1951); see Scandia Down Corp. v. Euorquilt, Inc., 772 F.2d 1423, 1432 (7th Cir.1985), cert. denied, 475 U.S. 1147, 106 S.Ct. 1801, 90 L.Ed.2d 346 (1986) (district courts in trademark cases "possess[ ] substantial discretion to decide how close is too close, once an infringer has committed a contempt of the original injunction"); World's Finest Chocolate, Inc. v. World Candies, Inc., 409 F.Supp. 840, 844 (N.D.Ill.1976), aff'd, 559 F.2d 1226 (7th Cir.1977) ("It is well established that the protection of a trademark requires that a party once convicted of infringement ... should keep a safe distance from the margin line between compliance with the order and a violation.").
 
 
 21
 The court also did not abuse its discretion in rejecting the defendants' contention that, because they had made a substantial good faith effort at compliance with the court's order, a finding of contempt was inappropriate. To the contrary, the record indicates that the defendants engaged in the process of compliance slowly and grudgingly, prompting three motions for civil contempt from Howard Johnson. This is not the case of a lodge or restaurant owner using his or her own initials to name an establishment, unaware that a similar trademarked name was being used by another facility. Rather, there was evidence before the court that the defendants deliberately sought a name that "would be close to Howard Johnson's name, yet ... not infringe." The defendants also were aware that other Howard Johnson lodges used the initials "HJ" to identify themselves. In fact, Amir Khimani described the use of the initials "HJ" in franchise manuals as "Howard Johnson's in short form." The court's finding that the defendants' use of the H.J. Inns name violated the preliminary injunction is well supported by the evidence and does not approach an abuse of discretion.
 
 
 22
 The defendants seek to absolve themselves of responsibility for violating the court's injunction by attributing the name change decision to other corporate entities. The defendants note that while Maralak owned the facilities at issue, the Melbourne and Cocoa locations were subleased to and operated by Aly Investments, Inc. (Aly). The defendants urge that the adoption of the H.J. Inns appellation was attributable to Aly rather than themselves. The court below questioned the purported control of the facilities by Aly and found that the name change was made with Khimani's knowledge and agreement. We agree.
 
 
 23
 Closer scrutiny of the relationship between the defendants and Aly belies the assertion that the defendants lacked either control of the facilities or responsibility for violating the injunction. Cf. Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 886 F.2d 1545, 1553 (9th Cir.1989) (finding "substantial and continuing connection" between infringing acts of parent and subsidiary). The evidence shows that Khimani's sons, who are corporate officers of defendant Torbay, are also officers and directors in Aly and own 66% of the company. Furthermore, the defendants concede that Khimani instructed Aly to chose a new name for the Cocoa and Melbourne lodges. Khimani subsequently examined the H.J. sign and testified that he was fully aware of the name change. In fact, Visram, the president of Aly testified that the decision to name the facilities H.J. Inns was made by Khimani and his son and that he subsequently changed the name at their direction.
 
 
 24
 Even accepting the defendants' contention that they lacked control over the facilities while they were subleased to Aly, the defendants concede that in January 1987, the properties were reconveyed to Maralak. Rather than using this opportunity to remedy any potential violation of the court's order, Maralak left the signs intact and conveyed the Cocoa property to a new sublessee along with an assignment of the non-exclusive right to use the name H.J. Inns. A month later, Maralak exhibited its control of the Melbourne property by having the H.J. Inns sign removed.[4] The district court had ample evidence to support its finding that the defendants were responsible for the violating the preliminary injunction.
 
 SANCTIONS
 
 25
 The district court awarded Howard Johnson $218,555.48 in compensatory sanctions for the defendants' civil contempt. The award of compensatory sanctions was based on the amount of royalties Howard Johnson would have received during this period from the Melbourne and Cocoa lodges ($9,727.66) multiplied by a factor of 1.5 due to "the flagrant and deliberate nature of the [d]efendants' continuing infringement," for a total of $14,591.49.[5] In addition to the lost royalties, the award of compensatory sanctions included $203,963.99 in profits earned by the defendants during the period of contempt under a theory of unjust enrichment or, alternatively, an application of the Lanham Act. 15 U.S.C. § 1117(a) (1982 & Supp.1989). The court also awarded the plaintiffs $15,919.67 for attorneys fees and costs incurred in connection with the contempt proceedings.
 
 
 26
 The defendants raise numerous objections to the district court's award of sanctions. First, they argue that the court lacked sufficient evidence of actual pecuniary loss suffered by Howard Johnson to support an award of compensatory damages based on franchise royalties. Essentially, defendants urge that the award of royalties was improper because Maralak was not using any of the services and benefits provided by the franchise, including participation in the Howard Johnson national reservation network.
 
 
 27
 District courts have broad discretion in fashioning civil contempt sanctions. United States v. United Mine Workers of America, 330 U.S. 258, 303-04, 67 S.Ct. 677, 701-02, 91 L.Ed. 884 (1947); Sizzler Family Steak Houses, 793 F.2d at 1536 n. 8. Here, the trial court referred to the remedies provided in section 35 of the Lanham Act as guidance for determining the appropriate measure of damages for violating an injunction in a trademark infringement case. Under the Lanham Act, a plaintiff whose trademark rights have been violated is entitled to recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). The Lanham Act also gives the court the discretion to treble the actual damage award and raise or lower the profit award as necessary to compensate the plaintiff. Id.
 
 
 28
 The district court's use of the Lanham Act to guide its structuring of the civil contempt sanction was reasonable and within its discretion. See, e.g., Rickard v. Auto Publisher, Inc., 735 F.2d 450, 458-59 & n. 37 (11th Cir.1984) (suggesting that Lanham Act could be followed in determining contempt sanctions in trademark infringement case); W.E. Bassett Co. v. Revlon, Inc., 305 F.Supp. 581, 594 (S.D.N.Y.1969) (following Lanham Act in imposing contempt sanction for violation of preliminary injunction), aff'd in part, rev'd in part, 435 F.2d 656 (2d Cir.1970) (reversing only the district court's denial of profit damages). Although we do not hold that a district court should impose Lanham Act remedies in a civil contempt action involving trademark misuse, we find that here the court's use of the act to provide a framework for determining the compensatory civil contempt award was not an abuse of discretion.
 
 
 29
 Reference to the Lanham Act was reasonable given the confluence of the trademark infringement subject matter of the statute and this case. Additionally, both the Lanham Act and the civil contempt sanction share a common underlying compensatory goal. Cf. Lanham Act § 35, 15 U.S.C. § 1117 (award "shall constitute compensation and not a penalty"); Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 719, 87 S.Ct. 1404, 1407-08, 18 L.Ed.2d 475 (1967) (referring to Lanham Act's provision for profit, damage, and cost awards as compensatory relief) with Leman v. Krentler-Arnold Hinge Last Co., 284 U.S. 448, 452-53, 52 S.Ct. 238, 240, 76 L.Ed. 389 (1932) (civil contempt awards must be compensatory, not punitive); Rickard, 735 F.2d at 459 (same).
 
 
 30
 The district court determined Howard Johnson's actual damages by calculating the amount of royalty payments it would have received during the period that the defendants were diluting or using a colorable imitation of its trademark had the defendants been a genuine Howard Johnson franchise. The use of lost royalties to determine the actual damages incurred by a victim of trademark misuse is well established in this court. See Ramada Inns v. Gradsden Motel Co., 804 F.2d 1562, 1565 (11th Cir.1986); Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg., 597 F.2d 71, 76 (5th Cir.1979); Holiday Inns, 493 F.Supp. at 1028; see also Bandag, Inc. v. Al Bolser's Tire Stores, Inc., 750 F.2d 903, 920 (Fed.Cir.1984) (royalties normally received for the use of a trademark may be an appropriate measure for damages when they bear a rational relationship to the rights appropriated). In both Ramada Inns and Holiday Inns, hold-over licensees who continued to use the licensor's trademarks on their lodges after the termination of the licenses were assessed sanctions based on lost royalty payments. See Ramada Inns, 804 F.2d at 1563; Holiday Inns, 683 F.2d at 932-33. Holiday Inns, in particular, presents factual circumstances remarkably similar to the present case because it involved a motel that used a colorable imitation of its former licensor's name, "Holiday Inns," by operating under the name "Holiday Hotel." See Holiday Inns, 683 F.2d at 932-33.
 
 
 31
 Maralak urges us to distinguish these cases because it did not enjoy all of the benefits of a Howard Johnson franchise, such as participation in the national reservation network and a listing in the Howard Johnson directory. This argument fails because neither of the defendants in Ramada Inns and Holiday Inns were shown to have received all of the benefits of an authorized franchisee. See Ramada Inns, 804 F.2d at 1563 (decision based on infringer's use of signs and graphics); Holiday Inns, 493 F.Supp. at 1027 (decision based on infringer's use of sign).[6] Moreover, by imitating Howard Johnson's name, the defendants took advantage of perhaps the most significant benefit of the Howard Johnson franchise. Customers selecting lodging in an unknown facility of a familiar franchise are likely to impute the characteristics of the franchise, including its general reputation, to the specific inn. When an unaffiliated lodge imitates a franchise name, it is exploiting the goodwill of that chain. See University of Georgia Athletic Ass'n v. Laite, 756 F.2d 1535, 1545 (11th Cir.1985) (defendant imitated school bulldog mark to capitalize on popularity of football program); Jellibeans, 716 F.2d at 843 (affirming district court's finding that defendant chose similar roller rink name to confuse public and capitalize on plaintiff's reputation); John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 977 (11th Cir.1983) (only plausible explanation for attempt to adopt a mark as close to plaintiff's as "legally" permissible is to "cash in" on plaintiff's goodwill); Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc., 659 F.2d 695, 704 (5th Cir. Unit A 1981) (same), cert. denied, 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982). Likewise, any unfavorable reaction of the imitator's patrons are likely to be attributed to the franchise as a whole and diminish its reputation. See Ramada Inns, 804 F.2d at 1564-66 (affirming damage award that compensated for Ramada Inns' lost reputation while hold-over franchisee was operating hotel poorly); Boston Professional Hockey Ass'n, 597 F.2d at 75 (affirming damage award that compensated in part for injury to plaintiff's reputation caused by poor imitation of product). It was, therefore, not an abuse of discretion for the district court to use lost royalty payments to replicate the actual damages suffered by Howard Johnson. See Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931) (where plaintiff's injury "is of such a nature as to preclude the ascertainment of the amount of damages with certainty ... it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate."); Ramada Inns v. Gadsden Motel Co., 804 F.2d 1562, 1565 (11th Cir.1986) (same).[7]
 
 
 32
 Maralak also objects to the district court's award of the profits generated by the Melbourne and Cocoa facilities during the period they were in contempt of the court's injunction. The defendants do not seriously challenge the discretion of a district court to award profits as part of a civil contempt sanction. Indeed, the Supreme Court has held that profits may be included as part of compensatory relief despite the absence of a showing of pecuniary loss. Leman, 284 U.S. at 456-57, 52 S.Ct. at 241-42.[8] The Second Circuit has even reversed a district court's refusal to consider profits as part of a compensatory contempt sanction. See Oral-B Laboratories v. Mi-Lor Corp., 810 F.2d 20, 25-26 (2d Cir.1987); W.E. Bassett Co., 435 F.2d at 664. Rather, the defendants contend that the court abused its discretion in awarding profits because such an award is only appropriate where the plaintiff sustains provable damage from the infringement, the defendant's conduct is a deliberate and willful violation, the infringer is unjustly enriched, and the sanction is necessary for future deterrence.
 
 
 33
 The defendants' proposition is erroneous. First, the cases relied upon by the defendants to derive a series of prerequisites for an award of profits are in the context of trademark infringement cases rather than civil contempt actions. In the civil contempt context the district court's discretion in imposing non-coercive sanctions is particularly broad and only limited by the requirement that they be compensatory. See Leman, 284 U.S. at 452-53, 52 S.Ct. at 240; Rickard, 735 F.2d at 459. Second, even in trademark infringement cases, the factors warranting profit awards are stated in the disjunctive. Maltina, 613 F.2d at 585; W.E. Bassett Co., 435 F.2d at 664. Therefore, a court could base a profit award upon a finding of any one of these factors. Finally, to the extent that an examination of these factors may assist the determination of whether the district judge abused her discretion in incorporating profits as part of the civil contempt sanction, the evidence provides ample justification for the award.[9]
 
 
 34
 Because the district court's finding of contempt and imposition of sanctions was within its discretion and the defendants' remaining arguments are meritless,[10] the district court's final judgment of civil contempt is AFFIRMED.
 
 
 
 *
 See Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit
 
 
 [1]
 The defendants erroneously contend that this court cannot rely on the deposition testimony of Visram to support the district court's grant of civil contempt because that testimony was not filed in the district court until October 20, 1987, several months after the May 14, 1987, civil contempt order. Defendants neglect to mention that this deposition was filed by plaintiffs in response to the defendants' motion to amend the court's civil contempt order. The court rejected the defendants' motion to strike the testimony as irrelevant and did not issue a final judgment of civil contempt until November 27, 1987--the same day it denied the defendants' motion for rehearing and reconsideration of the sanction order and over a month after the deposition had been filed in the district court
 
 
 [2]
 See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc) (adopting the case law of the former Fifth Circuit developed before October 1, 1981, as precedent for this circuit)
 
 
 [3]
 Similarly, in Clayton v. Howard Johnson Franchise Systems, Inc., a district court found the use of "HJ" in the name of a motor lodge to be "the colorable imitation of 'Howard Johnson's' and ... likely to cause confusion." No. 87-569-Civ-Orl-19, slip op. at 12 (M.D.Fla. July 27, 1988). The court also found "HJ" confusingly similar to "HJH." Id. at 17; see also Howard Johnson Co. v. Ho-Jo Campsites, Inc., 273 F.Supp. 447 (M.D.Fla.1967) (use of "Ho-Jo" likely to cause public to believe there is a connection between Howard Johnson and defendant's campsites)
 
 
 [4]
 Maralak took down the removable H.J. Inns lettering on the Melbourne marquee sign at the request of Howard Johnson, with whom it was conducting negotiations for a possible future franchise agreement. Maralak, by its own admission, did not remove the painted Cocoa sign because of the expense
 
 
 [5]
 Based on the terms of Howard Johnson franchise agreements, the royalty fees were calculated at a rate of 1.5% of gross restaurant sales and 5% of lodge gross revenues. The court declined to assess the 1% marketing contribution normally paid by Howard Johnson franchises because it did not constitute a royalty fee
 
 
 [6]
 In fact, if these cases are to be distinguished at all it is because Maralak, unlike the defendants in Ramada Inns and Holiday Inns, was not merely a former lodge licensee who had been enjoined from violating a franchise trademark. Rather, Maralak took the additional step of violating a court injunction and further injured the plaintiffs' trademark. This conduct likewise justifies the district court's finding that "the flagrant and deliberate nature of Defendants' continuing infringement" warrants the use of the 1.5 actual damage multiplier
 
 
 [7]
 Additionally, it seems reasonable to interpret the district court's refusal to include the 1% marketing contribution fee in the royalty damage award as a reflection of the fact that the defendants did not gain all of the advantages of the franchise. Arguably, even an award of such damages might have been appropriate because the defendants' locations at former Howard Johnson franchises and use of a similar name are likely to have misled customers enticed by Howard Johnson advertising campaigns into staying at the unaffiliated imitating facilities
 
 
 [8]
 In Holiday Inns, the Fifth Circuit approved a district court's imposition of both profits and royalty damages in a trademark infringement case. 683 F.2d at 933-35, aff'g, 493 F.Supp. 1025 (N.D.Tex.1980). Likewise, in Maltina Corp. v. Cawy Bottling Co., a district court awarded plaintiffs both the defendant's profits and damages to reputation and goodwill as part of a sanction for the defendant's violation of an injunction in a trademark infringement action. 613 F.2d 582, 583 (5th Cir.1980). The old Fifth Circuit did not question the propriety of awarding both profits and damages, but reversed the award of damages because the record was "wholly devoid of support for [the $35,000 damage] figure." Id. at 585-87. In contrast the judge below based the damage award on readily ascertainable royalty figures which were a reasonable reflection of the injury to reputation and goodwill suffered by Howard Johnson
 
 
 [9]
 For instance, the district court was not clearly erroneous in finding the defendants' conduct flagrant and deliberate. Likewise, the conduct of the defendants in persisting in a violation of Howard Johnson's trademark after they were preliminarily enjoined from doing so adds a specific deterrent value to the sanction while also providing a general deterrent to conduct evincing trademark infringement. Most significantly, the court did not abuse its discretion in awarding profits under a theory of unjust enrichment based on the evidence before it. See Manhattan Industries v. Sweater Bee by Banff, Ltd., 885 F.2d 1, 5-7 (2d Cir.1989). During the period of contempt the defendants both injured Howard Johnson by imitating its trademark without compensation and enriched themselves by tapping the reputation and good will of Howard Johnson through this imitation. The district court's royalty award remedies the defendants' colorable imitation of the plaintiff's trademark without compensation while the profit award remedies the impermissible gains made by the defendants' exploitation of the Howard Johnson mark through its imitation
 
 
 [10]
 For the first time on appeal, defendants contend that the award of profits as to the Cocoa facilities was improper because those profits were purportedly realized by the defendants' sub-lessee rather than themselves. The failure of a party to raise a theory of relief before the trial court generally precludes that party from arguing the theory on appeal. Singleton v. Wulff, 428 U.S. 106, 120-21, 96 S.Ct. 2868, 2877-78, 49 L.Ed.2d 826 (1976); Denis v. Liberty Mutual Insurance Co., 791 F.2d 846, 848-49 (11th Cir.1986); Lumpkin v. Ricketts, 551 F.2d 680, 682 n. 3 (5th Cir.), cert. denied, 434 U.S. 957, 98 S.Ct. 485, 54 L.Ed.2d 316 (1977). We decline to exercise our discretion to consider this argument because its resolution would inappropriately require this court to make factual findings. See Denis, 791 F.2d at 849; see also Holiday Inns, 683 F.2d at 934-35 (rejecting argument that defendant airport never received profits from trademark infringing inn because "[a]t no time before or during the trial on damages ... did Airport claim that it had not received profits earned by the hotel that it admittedly owned")