The **COLONIAL WILLIAMSBURG FOUNDATION, Plaintiff,**

v.

The **KITTINGER COMPANY, Defendant.**

**Civ. A. No. 3:91CV00055.**

United States District Court, E.D. Virginia, Richmond Division.

May 20, 1992.

Douglas Wayne Kenyon, Hunton & Williams, Raleigh, N.C., Ray Vinton Hartwell, Jr., George H. Gromel, Jr., Hunton & Williams, Richmond, Va., for plaintiff.

J. William Boland, Alexander H. Slaughter, McGuire, Woods, Battle & Boothe, Richmond, Va., Robert F. Wagner, Steven B. Larchuk, Dickie, McCamey & Chilcote, Pittsburgh, Pa., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

RICHARD L. WILLIAMS, Senior District Judge.

This matter is before the Court on the motions of the plaintiff, The Colonial Williamsburg Foundation ("Colonial Williamsburg"), for a finding of civil contempt against The Kittinger Company ("Kittinger"), Michael P. Carlow ("Carlow"), and Nicholas J. DeFino ("DeFino"), and for sanctions for violations of the Consent Judgment entered by this Court on February 25, 1991, and the Court's February 19, 1992, Discovery Order. Following a hearing on these issues on May 4 and 5, 1992, the Court now makes the following Findings of Fact and Conclusions of Law, pursuant to Fed.R.Civ.P. 52.

## I. FINDINGS OF FACT

1. Colonial Williamsburg is a non-stock corporation organized and existing under the laws of the Commonwealth of Virginia, with its principal place of business in Williamsburg, Virginia. Plaintiff's Exhibit 2, February 25, 1991, Consent Judgment, § III (hereinafter Consent Judgment).

2. Among its various functions, Colonial Williamsburg operates a museum reproductions program ("the Reproductions Program"), pursuant to which Colonial Williamsburg licenses selected manufacturers to make and sell, under the trademarks and trade names of Colonial Williamsburg, reproductions and adaptations of certain antiques within Colonial Williamsburg's collection. The Reproductions Program includes among its items certain designated pieces of furniture.

3. Colonial Williamsburg has adopted and has continuously used, both in the United States and many other parts of the world, certain trademarks and service marks to identify and distinguish its goods and services, which marks, through their use, have become well-known. Colonial Williamsburg's marks include: the words WILLIAMSBURG and COLONIAL WILLIAMSBURG; the letters CW and WF (as designations for furniture reproductions and adaptations, respectively); and the design, known as the "Hallmark," consisting of the words WILLIAMSBURG REPRODUCTIONS, the letters CW, and an elongated "4" ending in a double "XX," all enclosed in an oval. Colonial Williamsburg also has adopted and continuously used in the United States and many other parts of the world the trade name WILLIAMSBURG and COLONIAL WILLIAMSBURG. Colonial Williamsburg is the sole owner of all right, title, and interest in and to these marks and names, and of the goodwill that accompanies them. *See* Consent Judgment, §§ III–IV.

4. Kittinger is a corporation organized and existing under the laws of the State of North Carolina. Its principal place of business is Buffalo, New York. Kittinger is qualified to do, and is doing, business in Virginia. Consent Judgment, § III.

5. Carlow is Chairman of the Board of Kittinger, having been elected to that office on February 28, 1992. Plaintiff's Exhibit 38. As reflected in Kittinger's By-Laws, Carlow's duties and responsibilities as chairman include serving as the company's chief executive officer. Plaintiff's Exhibit 37.

6. From June 22, 1990, until February 28, 1992, Carlow served as president of Kittinger. Plaintiff's Exhibit 38. Carlow's duties and responsibilities as president included serving as the company's chief operating officer and supervising and controlling the management of the company. Plaintiff's Exhibit 37.

7. Because Kittinger had no chairman until Carlow's election in February of 1992, Carlow has at all relevant times been Kittinger's highest ranking officer. Plaintiff's Exhibits 37 & 38.

8. DeFino is president of Kittinger, having been elected to that office on February 28, 1992. Plaintiff's Exhibit 38. From

July 1990 until his election as president, DeFino was Vice–President of Operations. Plaintiff's Exhibit 39.

*Background and Procedural History*

9. For a period of more than fifty years Colonial Williamsburg and Kittinger maintained a licensing and business arrangement involving the collaborative design, manufacture, and sale of reproductions and adaptations of certain pieces of antique 18th century furniture, specimens of which are a part of Colonial Williamsburg's collection.

10. In early 1990, after frequent changes of ownership at Kittinger, Colonial Williamsburg became increasingly concerned that continued financial hard times would necessitate Kittinger's closing. Accordingly, the Licensing Agreement[1] with Kittinger was terminated on or about February 26, 1990, *see* Consent Judgment, § III, and Colonial Williamsburg negotiated a licensing agreement with Baker Furniture Company.

11. In June of 1990, 100% of Kittinger's common stock was acquired by USC Industries, Inc., a holding company that is majority owned by a second, Carlow controlled company. *See* Carlow Deposition, at 3–6, 15–16.

12. During the summer of 1990, Carlow and others met in Williamsburg to negotiate the termination of the Licensing Agreement between Kittinger and Colonial Williamsburg.

13. In late 1990, Kittinger filed suit in the Western District of New York, Buffalo Division,[2] seeking a declaratory judgment that certain provisions of the License Agreement were unenforceable under the patent and copyright laws of the United States and that certain of Colonial Williamsburg's trademarks were also unenforceable. *See* Plaintiff's Exhibit 1, Settlement Agreement, at 1–2 (hereinafter Settlement Agreement).

14. On January 25, 1991, Colonial Williamsburg filed the instant action alleging breach of contract, federal trademark infringement and false designation of origin, and related Virginia statutory and common law violations. *See* Consent Judgment, § II.

15. On February 19, 1991, Colonial Williamsburg and Kittinger entered into a Settlement Agreement that provided for the dismissal of the New York action and the entry of a Consent Judgment in the instant action. Settlement Agreement, at 2.

16. The Settlement Agreement also provides that "[a]ny party seeking to enforce its rights pursuant to this Settlement Agreement or the attached Consent Judgment and who substantially prevails in enforcing those rights shall be paid by the party against whom such enforcement is sought any fees or costs incurred, including reasonable attorneys' fees, as a result of such enforcement." Settlement Agreement, at 4–5.

17. This Court entered the Consent Judgment, in accordance with the Settlement Agreement, on February 25, 1991. The Court's jurisdiction, however, was expressly retained to allow "the parties to apply to this Court for such further orders as may be necessary or appropriate for the construction, implementation, modification, or enforcement of this Consent Judgment, and for punishment of any violation of this Consent Judgment." Consent Judgment, § XVII.

18. Section VI of the Consent Judgment enjoins Kittinger, as of April 1, 1991, from using Colonial Williamsburg's various marks and names or any marks or names "likely to cause confusion, or to cause mistake, or to deceive." Additionally, section VI prohibits Kittinger from,

> [i]n connection with the sale of its products, referring directly or indirectly to Colonial Williamsburg, to Kittinger's former status as a licensee of Colonial Williamsburg, to specific items in the collections of Colonial Williamsburg, or to the restoration of Virginia's Colonial capital in Williamsburg, Virginia; and

---

1. A copy of the Licensing Agreement is attached as Exhibit A to the Consent Judgment.

2. *See Kittinger Co. v. Colonial Williamsburg Foundation,* No. CIV–90–1313–A.

3. Disseminating, publishing, distributing, or otherwise using information or materials of any kind whatsoever containing a false designation of origin, or false description, or false representation, or likely to deceive the relevant consuming public into thinking that any goods or services offered by Kittinger, are in any manner associated or connected with, or licensed, authorized, sponsored, endorsed or approved by Colonial Williamsburg.

19. Section VII, in turn, enjoins Kittinger, as of April 1, 1991, from:

manufacturing and/or selling the Licensed Products or any products so similar in appearance to the Licensed Products as to be likely to cause confusion, or to cause mistake, or to deceive the relevant consuming public into thinking that such products are the Licensed Products or are in any manner associated or connected with, or licensed, authorized, or approved by Colonial Williamsburg.

20. Section VIII of the Consent Judgment provided that Kittinger was to give Colonial Williamsburg access to its books to allow the determination of additional royalties and the number and status of licensed pieces ordered but not yet completed.

21. Section IX generally enjoined Kittinger from "commencing the manufacture of any Licensed Products whose assembly was not already in progress as of February 15, 1991," with the clarification that through March 31, 1991, Kittinger could "(1) sell Licensed Products through its showrooms, (2) complete the manufacture into finished pieces of work-in-progress pieces whose assembly was already in process as of February 15, 1991," and (3) ship finished pieces in order to fill orders accepted by the close of business on March 15, 1991, *"provided,* that all such manufacture shall be completed and all sales and shipments of Licensed Products made no later than March 31, 1991, except that shipments of Licensed Products sold through Kittinger showrooms may be made through April 5, 1991."

22. Sections IX and X provide a schedule for the calculation and payment of royalties. Additionally, section X provided for the audit of Kittinger's books "with respect to such payments and the transactions related thereto."

23. Section XI of the Consent Judgment required Kittinger to "deliver up to Colonial Williamsburg or its designee, or destroy in the presence of Colonial Williamsburg or its designee, all Licensed Products, whether finished pieces or work-in-progress pieces, remaining within its possession, custody, or control" on April 1, 1991.

24. Section XII provides that

[o]n or before April 15, 1991, Kittinger shall deliver ... or destroy ... all of the following specialized materials, including all copies or duplicates thereof, used by Kittinger to manufacture the Licensed Products:

1. Plans, including "shop drawings" in both original and tag formats;
2. Castings and molds;
3. Hardwood carving models;
4. Development files; and
5. Photographs, provided by Colonial Williamsburg, of Licensed Products or any antiques in its collection.

Kittinger shall otherwise be permitted to retain and use its present inventory of parts and the various devices used in the manufacture of its products generally, *provided* that the use by Kittinger of such parts and devices does not place Kittinger in violation of the terms of this Consent Judgment, and *provided further* that Kittinger undertakes the affirmative obligation to modify such parts and devices to the extent necessary to ensure their use in compliance with this Consent Judgment.

25. Section XIV of the Consent Judgment provides:

On or before April 15, 1991, Kittinger shall deliver ... or destroy ... all advertisements, brochures, stationery, and other promotional materials of any type bearing any of the marks and names referred to in the Agreement or in this Consent Judgment, *provided* that Kittinger may retain product catalogues for archival purposes and to facilitate its

compliance with the terms of this Consent Judgment, and *provided further* that Kittinger may continue to use its current product catalogues through July 31, 1991 if those catalogues bear, or any entries therein pertaining to Licensed Products, stickers approved by Colonial Williamsburg indicating that Kittinger is no longer licensed to used [sic] the Licensed Products.

26. Section XV required Kittinger, on or before April 30, 1991, to certify by affidavit to the Court that it had complied with the terms of the Consent Judgment, specifying the time and manner of such compliance.

27. Section XVI makes the terms of the Consent Judgment applicable, not just to Kittinger, but to all its employees, agents, servants, successors, assigns, and all persons in active concert or participation with any of the aforementioned.

28. On April 30, 1991, DeFino filed an Affidavit of Compliance with the Consent Judgment with the Court. *See* Plaintiff's Exhibit 3, Affidavit of Compliance with the Consent Judgment (hereinafter Affidavit of Compliance).

29. On February 5, 1992, Colonial Williamsburg filed a motion requesting an order to show cause why Kittinger, Carlow, and DeFino should not be held in contempt and requesting discovery.

30. On February 19, 1992, the Court entered an Order directing the defendants to appear on March 24, 1992, to show cause why they should not be held in contempt for violating the terms of the Consent Judgment. *See* Plaintiff's Exhibit 4, Order of February 19, 1992.

31. The same day, the Court ordered Kittinger to appear, and to cause Carlow and DeFino to appear, for deposition in Buffalo starting on March 5, 1992. Additionally, Kittinger was ordered to produce certain documents and tangible things at Kittinger's Buffalo, New York, plant for inspection and copying on March 4, 1992. Among the items to be produced were (a) all Colonial Williamsburg Licensed Products and the parts thereof in Kittinger's possession, custody, or control, (b) all mate-

rials and equipment used in the manufacture or production of the Licensed Products, including plans, shop drawings, and other specialized materials and equipment, (c) all furniture products and parts thereof similar in design and appearance to the Licensed Products, and (d) all materials and equipment used in the manufacture or production of such similar furniture products and parts. *See* Plaintiff's Exhibit 4, Order of February 19, 1992 (hereinafter Discovery Order).

32. On March 4, 1992, Colonial Williamsburg was advised through an anonymous telephone call that evidence had been removed from the Buffalo plant and transported to Kittinger's Castile, New York factory and warehouse. In addition, the caller advised Colonial Williamsburg that other relevant materials had been hidden in a third floor woman's bathroom in the Buffalo plant.

33. On March 5, 1992, Colonial Williamsburg filed an *ex parte* motion with the Court requesting the seizure and impounding of the concealed evidence. In a March 5, 1992 Order, the Court directed the United States Marshall's Service to effectuate the seizure of the listed categories of items. *See* Order of March 5, 1992 (hereinafter Seizure Order).

34. On March 9, 1992, the United States Marshall's Service executed the Seizure Order and seized or impounded a variety of materials. Among the materials seized or impounded were finished and unfinished pieces of furniture, plans and drawings used in the manufacture of Licensed Products, and development files. *See* Plaintiff's Exhibits 5–7, Marshall's Inventories of Seized and Impounded Property; Testimony of Driscoll.

35. On March 10, 1992, Kittinger and DeFino refused to continue their depositions.

36. The Court, on March 12, 1992, ordered the resumption of those depositions and ordered that they be conducted in Richmond, Virginia.

37. On March 12, 1992, Colonial Williamsburg moved for sanctions against

Kittinger, Carlow, and DeFino for violating the Discovery Order.

38. On March 16, 1992, the Court denied a motion by the defendants to stay the proceedings. The Court did, however, continue the show cause hearing until May 4, 1992, and consolidated it with a hearing on the motion for sanctions.

*Summary of Contemptuous Conduct*

39. Kittinger has deliberately and systematically violated the Consent Judgment in a number of material respects. These violations include, but are not limited to:

(a) Kittinger's unlawful retention of blueprints, ozalids, CAD drawings, tag drawing, development files, and photographs, *see, e.g.*, Plaintiff's Exhibits 5–7; Testimony of Driscoll;

(b) Kittinger's concealment of furniture, parts, and other materials that were to have been delivered up or destroyed by April 15, 1991, *see, e.g.*, Collopy Deposition; Lehning Deposition, at 95–97;

(c) Kittinger's shipping of Licensed Products during the period from April 8 through August 14, 1991, *see* Plaintiff's Exhibit 40;

(d) Kittinger's sale of a C8160/CW160 table to Kraft General Foods, Inc., in October of 1991, that was so similar in appearance to prior Licensed Product as to be likely to cause confusion, *see, e.g.*, Plaintiff's Exhibit 27; Testimony of Philben and Scalia; Murray Deposition, at 51;

(f) Additional sales of confusingly similar products by Kittinger through at least March 12, 1992, Testimony of Kaumeyer; Lehning Deposition, at 107–11, 114–16;

(g) Kittinger's unlawful retention and use of enjoined promotional materials in the marketing of those products offered in lieu of Licensed Products, *see, e.g.*, Watson Deposition, at 8–12, 27–30;

(h) Kittinger's conscious effort to create a confusingly similar line of products (the HK line) through the use of unlawfully retained blueprints and drawings, *see* Testimony of Driscoll (concluding that all of the HK line is confusingly similar except the Secretary Desk, HK5502 (old CW1)); Lehning Deposition, at 83, 107–11, 166–68, 179, 180–82, *et seq.;* Marshall's Seized Item 12 (Kittinger green notebook with Lehning's proposed HK designs);

(i) Kittinger's failure to pay royalties, DeFino Deposition, at III–29;[3] and

(j) Kittinger's filing, through DeFino, of a materially false affidavit with the Court swearing to its compliance with the Consent Judgment.

40. More egregious than any of the specific breaches was the defendants' utter lack of respect for their obligations under the Consent Judgment. The evidence is clear that no responsible person in the hierarchy of Kittinger made any effort to see that the terms and requirements of the Consent Judgment were disseminated to the employees of Kittinger in a manner that would alert them to their legal obligations thereunder. *See, e.g.*, DeFino Deposition, at I–124 (could not specifically recall any conversations with Carlow concerning the Consent Judgment); Carlow Deposition, at 59–60 (never read the Consent Judgment); Coffey Deposition, at 102–05 (never saw the Consent Judgment until approximately two weeks before his deposition); Murray Deposition, at 43–44, 103–05 (only speculative knowledge of the Consent Judgment).

41. The defendants also deliberately and systematically violated the Discovery Order by moving and concealing furniture, parts, plans, drawings, and other documents and materials required to be produced. Documents detailing these items were not discovered until a deposition after the seizure. Further, it was more than a month after the seizure before Kittinger produced the shipping list for the items concealed to avoid the April 1991 inspection called for in the Consent Judgment. *See, e.g.*, Plaintiff's Exhibits 46 & 54; Lehning Deposition, at 57–73; Pugliese Deposition; Wyant Deposition.

---

**3.** DeFino's deposition was taken on two separate occasions, the last covering two days. Each day of the deposition is designated as a separate volume. The relevant volume number will proceed the page number.

*Detail of Contemptuous Conduct*

42.  In late 1990 or early 1991, Kittinger embarked on a concerted program of copying the plans, drawings, and related papers for the Licensed Products as a hedge against having to turn the originals over to Colonial Williamsburg.  Lehning Deposition, at 235–36.

43.  These copies were intended to be used, and were used, as the basis for the development of a new product line.  Indeed, the blueprints of the Licensed Products were simply modified in creating the new line.  DeFino Deposition, II–63; Lehning Deposition, at 166–68, 179; Kittinger Deposition Exhibit 12.

44.  On or about March 26, 1991, Kittinger removed numerous materials from its Buffalo plant to prevent their being delivered to Colonial Williamsburg or destroyed as required by the Consent Judgment.  These included approximately 85 pieces of "white stock" and "carcasses" for CW, WF, and WA pieces.  Plaintiff's Exhibit 46; Collopy Deposition, at 16, 19–20.  Plans, drawings, and related materials for the Licensed Products were also shipped out to prevent their discovery.  Collopy Deposition, at 20; Lehning Deposition, at 95–97.

45.  Beginning on April 8, 1991, and continuing through August 14, 1992, Kittinger sold and/or shipped 121 Licensed Products, each bearing the trademark of Colonial Williamsburg.  *See* Plaintiff's Exhibit 40.

46.  This was contrary to Kittinger's assurances that it had tendered all remaining Licensed Products to Colonial Williamsburg on April 15, 1991, and that it had destroyed the plans, drawings, and other materials as called for in the Consent Judgment.  *See* Affidavit of Compliance, paras. 9 & 11.

47.  On May 1, 1991, a letter published under what was purported to be Carlow's signature and directed to Kittinger's customers made direct reference to Kittinger's past relationship with Colonial Williamsburg.  Testimony of Carlow.

48.  Beginning on May 8, 1991, and continuing at least through March 12, 1992, Kittinger sold and/or shipped approximately 324 furniture pieces bearing the C8, W8, or HK designations.  Each of these pieces was manufactured from plans and drawings originally used to manufacture Licensed Products.  *See* Plaintiff's Exhibit 41; Lehning Deposition, at 166–68, 175–79.

49.  Despite repeated demands, Kittinger has not paid royalties on the sale of Licensed Products since December 1990, including the royalties for the Licensed Products shipped between April 8 and August 15, 1991.  Kittinger presently admits that Colonial Williamsburg is entitled to $105,063.00 in royalties.  DeFino Deposition, at III–29.

50.  Throughout the Spring and Summer of 1991, Kittinger used tear sheets for Licensed Products in the sale of its "new" products.  Watson Deposition, at 10.

51.  Unless customers specifically asked, they were not advised that they would not be getting Colonial Williamsburg licensed furniture.  When they did ask, Watson told them that they would be getting basically the same product, only "slightly changed" and without Colonial Williamsburg's insignia or burn mark.  Watson Deposition, at 11, 29.

52.  On October 10, 1991, Kittinger accepted an order from International Business Interiors, Inc. ("IBI") for a "CW160" Colonial Williamsburg reproduction drop leaf table.  *See* Plaintiff's Exhibit 28.  Kittinger responded by confirming that it would ship such a table to the client, Kraft General Foods, under stock number C8160.  Plaintiff's Exhibit 29.  No one at Kittinger informed the interior designer at Perkins & Will, who had originally consulted with the sales personnel at the Chicago showroom, that Kittinger could not deliver a CW160 table or that Kraft would be getting a materially different item.  Testimony of Scalia.  Further, Philip L. Philben ("Philben"), who received Kittinger's bid, saw the table referred to as a "C–8160 (CW–160)."  He understood the designation to mean that Kraft would receive a CW–160, the "C–8160" being just an internal number used at Kittinger.  He so concluded because the Colonial Williamsburg product

was what had been ordered and they had never been informed that they would not receive that product. *See* Plaintiff's Exhibit 27, Proffered Testimony of Philben.

53. On December 3, 1991, Colonial Williamsburg's counsel received a copy of the plans for Kittinger's C–8160 table. Plaintiff's Exhibit 47. On December 4, 1991, Colonial Williamsburg advised Kittinger that the table was so similar in design to the old CW–160 that it was likely to cause confusion, mistake, or otherwise deceive the relevant consuming public. *See* Defendant's Exhibit U. Colonial Williamsburg demanded "that Kittinger 'immediately suspend all manufacturing, sales, and shipments' of the C8160 table as required by Section VII of the Order" and emphasized that "[b]ased on this provision, Kittinger is precluded from offering C8160 tables for sale either at the warehouse sale ... or the factory sale ..., and is further precluded from filling any orders for tables now in progress." *Id.*

54. On December 5, 1991, Kittinger's counsel assured Colonial Williamsburg that Kittinger had been advised to suspend all sales of the C8160 table as required by the Consent Judgment. Defendant's Exhibit U. Notwithstanding these assurances, Kittinger offered the C8160 tables for sale at the warehouse sale on December 5 and 6, 1991. Testimony of Kaumeyer.

55. Additionally, Kittinger shipped a C8160 table to Kraft General Foods on January 29, 1992. Plaintiff's Exhibit 30.

56. On February 27 and 28, 1992, and on March 2, 1992, Kittinger removed and secreted numerous items which were required to be have been delivered to Colonial Williamsburg or destroyed by April 15, 1991 under the terms of the Consent Judgment and which were required to have been produced under the terms of the Discovery Order. Plaintiff's Exhibits 5–7, 46, 52.

57. While DeFino denied knowledge of the concealment of the evidence, this testimony is incredible given other testimony and DeFino's day-to-day control of Kittinger. *See, e.g.,* Lehning Deposition, at 57–59, 70–71, 75–78; Prieur Deposition, at 111–15.

58. Additionally, the evidence is clear that DeFino had a direct hand in orchestrating violations of the Consent Judgment. *See* Lehning Deposition, at 95–96.

59. The actions of each of the defendants, Kittinger, Carlow, and DeFino, in the instant case were deliberate, willful, and in bad faith.

60. Kittinger's unauthorized use of Colonial Williamsburg's trademarks, including WILLIAMSBURG, CW, WF, and the Hallmark, as well as Kittinger's promotion and sale of products bearing the designators C8, W8, and HK enabled Kittinger to trade on the reputation and goodwill of Colonial Williamsburg by offering nearly identical products to consumers who inquired about Colonial Williamsburg products. Further, these pieces are likely to cause confusion among the consuming public and to cause that public to believe, mistakenly, that Kittinger's products are approved by, authorized by, sanctioned by, affiliated with, or otherwise associated with Colonial Williamsburg. Testimony of Driscoll.

## II. CONCLUSIONS OF LAW

### A. Contempt

1. The Court's jurisdiction in the instant case is based on section XVII of the Consent Judgment and "the long recognized, inherent jurisdiction of federal courts to protect and enforce their orders and judgments." *Omega World Travel, Inc. v. Omega Travel, Inc.,* 710 F.Supp. 169, 170 (E.D.Va.1989) (citing *Riggs v. Johnson County,* 73 U.S. (6 Wall.) 166, 187, 18 L.Ed. 768 (1867)), *aff'd by unpubl. op.,* 905 F.2d 1530 (4th Cir.1990).

2. To establish civil contempt, Colonial Williamsburg must prove:

(1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) a showing that the decree was in the movant's 'favor'; (3) a showing that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such vi-

olations; and (4) a showing that movant suffered harm as a result.

*Id.*

3. Each of these elements must be shown by clear and convincing evidence. *See, e.g., Stotler and Co. v. Able,* 870 F.2d 1158, 1163 (7th Cir.1989).

### Knowledge of a Valid Decree

■ 4. There is no debate as to the validity of the Consent Judgment or the Discovery Order. It is similarly clear that all three defendants had actual or constructive knowledge of both the Consent Judgment and the Discovery Order.

### Decree in Movant's "Favor"

5. The Consent Judgment was clearly in Colonial Williamsburg's "favor." It was explicitly directed at affecting Kittinger's behavior in regards to the Licensed Products, and, accordingly, inured to the benefit of Colonial Williamsburg. *Cf. Rhodes v. Stewart,* 488 U.S. 1, 3–4, 109 S.Ct. 202, 203–04, 102 L.Ed.2d 1 (1988).

6. The Discovery Order was likewise in Colonial Williamsburg's "favor." The Discovery Order commanded Kittinger to provide certain documents and things to Colonial Williamsburg, to produce certain witnesses for depositions, and ordered Kittinger to reimburse Colonial Williamsburg for certain expenses associated with the discovery. Discovery Order, at paras. 2–4.

### Violation of the Order

7. As specified in the Findings of Fact, the defendants have deliberately, systematically, and repeatedly violated the Consent Judgment and the Discovery Order.

### Injury

8. There is also no question but that Colonial Williamsburg has been injured by the defendants' violations of the Consent Judgment. At a minimum, Kittinger admits that it owes Colonial Williamsburg $105,063.00 in royalties. In addition to this very concrete monetary injury, Kittinger's sale of Licensed Products and of confusingly similar furniture has injured the good-

will Colonial Williamsburg has in its name and products. With regard to the Discovery Order, it is clear that Colonial Williamsburg was forced to incur additional costs because of the defendants having hidden responsive materials. While these do not constitute the sum of all of the injuries suffered by Colonial Williamsburg, they are more than adequate to establish civil contempt. *See Church of Scientology Int'l v. Elmira Mission of Church of Scientology,* 794 F.2d 38, 43 (2d Cir.1986); *Omega World Travel,* 710 F.Supp. at 171.

9. Accordingly, Kittinger, Carlow, and DeFino are found to be in contempt for their violations of the Consent Judgment and the Discovery Order. Further, each will be jointly and severally liable for the sanctions imposed as a result of the finding of contempt.

■ 10. The imposition of joint and several liability on Carlow is justified under the facts of the instant case. Section XVI of the Consent Judgment, by its terms, makes the Consent Judgment applicable to Kittinger, its employees, agents, servants, successors, assigns, and all persons in active concert or participation with Kittinger or the aforementioned. Further, the case law establishes that an individual who is responsible for ensuring that a corporation complies with a court order cannot escape liability merely by removing himself from the day-to-day operations of the corporation and washing his hands of responsibility. In the instant case, the evidence is clear that Carlow took none of the affirmative steps necessary to ensure Kittinger's compliance with the Consent Judgment. *See Wilson v. United States,* 221 U.S. 361, 376, 31 S.Ct. 538, 542, 55 L.Ed. 771 (1911) ("A command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt."); *Connolly v. J.T. Ventures,* 851 F.2d 930, 934–35 (7th Cir.

1988); *NLRB v. Maine Caterers, Inc.*, 732 F.2d 689, 691 (1st Cir.1984). Carlow's total dereliction of responsibility cannot be countenanced by this Court.

11. The propriety of imposing joint and several liability on DeFino is even clearer. Not only was he directly responsible for Kittinger's compliance with the Consent Judgment and the Discovery Order, but the evidence demonstrates that he willfully participated in and directed the hiding of items that should have been destroyed under the terms of the Consent Judgment, filed an admittedly false affidavit of compliance, and participated in and directed the hiding of documents and items that were to be produced under the Discovery Order.

## B. Relief

■ 12. "[A] sanction imposed on a party held to be in civil contempt generally may serve either or both of two purposes: to coerce the contemnor into complying in the future with the court's order, or to compensate the complainant for losses resulting from the contemnor's past noncompliance." *Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 673 F.2d 53, 56 (2d Cir.), *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982); *see also Connolly*, 851 F.2d at 932; *Omega World Travel*, 710 F.Supp. at 171.

13. Moreover, "a court has broad discretion to fashion a remedy based on the nature of the harm and the probable effect of alternative sanctions." *Connolly*, 851 F.2d at 933 (citing *U.S. v. United Mine Workers*, 330 U.S. 258, 303–04, 67 S.Ct. 677, 701–02, 91 L.Ed. 884 (1947)).

### Disgorging of Profits

■ 14. A civil contempt fine, even when compensatory in nature, need "not always [be] dependant on a demonstration of 'actual pecuniary loss.'" *Manhattan Indus., Inc. v. Sweater Bee By Banff, Ltd.*, 885 F.2d 1, 5 (2d Cir.1989) (citing *Leman v.*

**4.** It should be noted that section 35(a) is being used merely as an analogy; Colonial Williamsburg need not have established all the elements of a cause of action under the Lanham Act to be entitled to a disgorging of profits. *See Howard*

*Krentler–Arnold Hinge Last Co.*, 284 U.S. 448, 455–56, 52 S.Ct. 238, 241–42, 76 L.Ed. 389 (1932)), *cert. denied*, 494 U.S. 1029, 110 S.Ct. 1477, 108 L.Ed.2d 614 (1990); *see also Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1521 (11th Cir.1990); *Connolly*, 851 F.2d at 933–34.

15. A useful analogy in determining what would constitute compensation for violations such as the defendants' is provided by section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a). *See Howard Johnson*, 892 F.2d at 1519. Section 35(a) provides:

When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, or a violation under section 43(a), shall have been established ... the plaintiff shall be entitled ... to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.... In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed.

15 U.S.C. § 1117(a).[4] *See also Leman v. Krentler–Arnold Hinge Last Co.*, 284 U.S. 448, 455–57, 52 S.Ct. 238, 241–42, 76 L.Ed. 389 (1932) (approving of "[p]rofits ... as an equitable measure of compensation" in a civil contempt proceeding for a violation of a permanent injunction in a patent infringement suit); *Sweater Bee By Banff*, 885 F.2d at 5–6 (violation of a consent judgment in a trademark infringement suit); *Connolly*, 851 F.2d at 933–34 (violation of a consent judgment in a copyright infringement suit).

■ 16. Additionally, a disgorging of profits is warranted as a means of deterring future violations. *See Oral–B Labs., Inc. v. Mi–Lor Corp.*, 810 F.2d 20, 25–26 (2d Cir.1987). Requiring Kittinger to pay royalties would merely place it in the position it would have been in had the licensing agreement remained in effect; i.e., a better position than it would have been in had it obeyed the Consent Judgment.

*Johnson*, 892 F.2d at 1521. Similarly, the Court will not hold the defendants to the standard of proof set out in section 35(a) for the deduction of costs. *See infra*, para. 18.

17. Subsequent to April 15, 1991, the date on which Kittinger was to have destroyed or tendered delivery of all remaining Licensed Products, Kittinger sold and/or delivered 121 pieces of the Licensed Products for gross sales of $159,295.99. *See* Plaintiff's Exhibit 40.

18. The burden of proof rests on the defendants "to prove any deductions for its costs from the gross revenues attributable to its contempt." *Oral–B*, 810 F.2d at 26; 15 U.S.C. § 1117(a). Nevertheless, the Court concludes that it would be inequitable and unnecessarily excessive to force the defendants to repay all revenues derived from the sale of Licensed Products. Kittinger certainly incurred substantial overhead in the production of the Licensed Products. Further, the quality of workmanship added value to the finished product. Accordingly, the Court has determined that the defendants will be required to pay Colonial Williamsburg a third of the revenue derived from the sale of Licensed Products in violation of the Consent Judgment as general compensation and as a deterrent against future violations. Therefore, the defendants will be required to pay Colonial Williamsburg $53,098.66 as a disgorging of profits. *See* Plaintiff's Exhibit 40.

19. In addition, Kittinger sold 324 pieces of furniture bearing the C8, W8, or HK designations in the period after April 15, 1991. The proceeds from these sales totaled $344,997.31. Plaintiff's Exhibit 41.

20. With the exception of seven pieces, these lines both were designed and manufactured from plans and drawings unlawfully copied and retained by Kittinger and were so similar to the Licensed Products that they were apt to mislead and confuse consumers as to their origin and/or connection with Colonial Williamsburg. *See* Testimony of Coffey; Testimony of Driscoll; Plaintiff's Supplemental Proposed Findings of Fact and Conclusions of Law, at para. 1. This conduct constituted a clear and deliberate attempt to trade on Colonial Williamsburg's goodwill and is,

therefore, roughly equivalent to a suit for unfair competition under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

21. Accordingly, the disgorging of profits for the sale of the offending pieces is appropriate as both a compensatory and a coercive sanction. *See* 15 U.S.C. §§ 1117(a) and 1125(a); *Howard Johnson*, 892 F.2d at 1519; *Oral–B*, 810 F.2d at 25–26.

22. The total revenues from the sale of these offending pieces was $296,310.81. Plaintiff's Exhibit 41; Testimony of Coffey; Plaintiff's Supplemental Proposed Findings of Fact and Conclusions of Law, at para. 1.

23. Again, an award of full revenues would be inequitable and unnecessary to compensate Colonial Williamsburg or to deter future violations by the defendants. An award of one-third of the revenues is adequate to achieve these goals. Thus, the defendants will be required to pay Colonial Williamsburg $98,770.27.

### Unpaid Royalties

24. It is uncontroverted that $105,063 in royalties are due and owing to Colonial Williamsburg for Kittinger's sale of Licensed Products.

25. $9,904.40 of these royalties, however, relate to Licensed Products sold and/or delivered after April 15, 1991. Since this portion of the royalties has already been accounted for through the disgorging of profits, this amount will be deducted from the royalties that Kittinger has admitted it owes. Accordingly, the defendants will be required to pay Colonial Williamsburg $95,158.60 in royalties plus interest at a rate of 12% calculated from April 15, 1991.[5]

### Attorney's Fees and Costs

26. On a number of different bases, Colonial Williamsburg is entitled to its reasonable attorney's fees and costs.

27. First, the Settlement Agreement entered into by the parties expressly provides

---

**5.** The interest rate is that agreed upon by the parties for overdue royalties. *See* Consent Judgment, § VIII. This agreement between the parties will be carried forward in this judgment.

for the award of attorney's fees. Settlement Agreement, at 4–5. The defendants, citing *NBA Properties, Inc. v. Gold*, 895 F.2d 30 (1st Cir.1990), argue that because the Consent Judgment does not expressly incorporate the Settlement Agreement this provision is void and unenforceable. The defendants, however, misconstrue the import of *NBA Properties*. *NBA Properties* merely holds that something not incorporated in the consent judgment cannot be a basis for a finding of contempt; the enforceability of the Settlement Agreement as a contract, however, remains unaffected. *Id.* at 34 ("The nonbreaching party may be able to obtain an order enforcing the private agreement, but without such an order, a court cannot hold the breaching party in contempt." (citation omitted)).

28. Additionally, with regard to both the Consent Judgment and the Discovery Order, the defendants violations were continuous and willful. As such, Colonial Williamsburg is entitled to fees and costs as an appropriate sanction for the defendants' contumacy. *Cf. Alyeska Pipeline Service Co. v. Wilderness Soc'y*, 421 U.S. 240, 258, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975) (citing the award of "attorneys' fees for the 'willful disobedience of a court order . . . as part of the fine to be levied on the defendant'" as one of the traditional exceptions to the American Rule (citation omitted)).

29. Finally, Colonial Williamsburg is entitled to the fees and costs associated with the defendants' violation of the Discovery Order. *See* Fed.R.Civ.P. 37(b)(2) ("In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.").

30. If the parties are unable to reach a settlement on reasonable attorneys' fees and costs, Colonial Williamsburg shall file its request for attorneys' fees and costs, accompanied by the requisite supporting documentation, within seven working days from the entry of the accompanying Final Order. The defendants will then have five working days to file their objections. Colonial Williamsburg will have three working days to file a reply to those objections.

31. Colonial Williamsburg is also entitled to $5,319.89 in travelling and lodging costs incurred during the discovery in Buffalo.[6] *See* Discovery Order, at para. 4; Plaintiff's Exhibit 55.

### Additional Relief

32. Kittinger is to surrender to Colonial Williamsburg, at Williamsburg, Virginia, within forty-five days from the entry of the accompanying Final Order, all CW, WF, and WA products in any stage of production. Kittinger shall, at the same time and place, surrender to Colonial Williamsburg all C8, W8, and HK products that were in any way directly derived from any preceding CW, WF, or WA products. All such products were designed from plans and drawings Kittinger had no right to retain or use under the Consent Judgment. As such, all products derived from those plans and drawings constitute fruits of Kittinger's disobedience and must be forfeited.

33. Additionally, again at the same time and place, Kittinger is to surrender all the following materials, including all copies and duplicates thereof, used in whole or in part, at any time, to manufacture any of the six above listed lines of furniture:

(a) Plans, including "shop drawings," in both original and tag formats;

(b) Any plans or designs that have been reduced to computer or any other similar format;

(c) Jigs and fixtures;

(d) Castings and molds;

(e) Hardwood carving models and any other specialized devices or models

---

**6.** To the extent any portion of the $5,319.89 in cost would duplicate Colonial Williamsburg's request for reasonable attorneys' fees and costs, they should be excluded from Colonial Williamsburg's request.

used in carving, shaping, cutting, or finishing;

(f) Design and engineering files;

(g) Development files; and

(h) Photographs.

34. Kittinger is enjoined from marketing or selling any of the C8, W8, or HK products that were in any way directly derived from the preceding CW, WF, or WA products, drawings, plans, molds, or models.

35. Kittinger shall, as many as four times per year for the next four years, at the discretion of Colonial Williamsburg, make its premises, books, and records available for inspection and copying by Colonial Williamsburg. The inspections may be unannounced and conducted at the discretion of Colonial Williamsburg. They shall, however, be conducted during Kittinger's regular working hours.

36. Within ten working days after entry of the accompanying Final Order, Kittinger shall distribute copies of the Consent Judgment and the accompanying Final Order to each of its directors, officers, shareholders, employees, and agents, including contract representatives. Copies of the same shall be provided to any director, officer, shareholder, employee, or agent, including a contract representative, who becomes associated with Kittinger within the next three years.

37. Finally, the terms of the Consent Judgment shall remain in effect to the extent they do not conflict with the accompanying Final Order. If there is a conflict, the terms of the accompanying Final Order shall govern.