ROBIN WOODS, INC., a Pennsylvania Corporation, Plaintiff,

v.

Robin F. WOODS, an individual; and the Alexander Doll Company, a New York corporation, Defendants.

Civ. A. No. 91–2186.

United States District Court, W.D. Pennsylvania.

Dec. 18, 1992.

858

Bela Kalowitz, Charles Himmelreich, Pittsburgh, PA, for plaintiff.

John H. Bingler, Jr., Julie A. Maloney, Chad Cicconi, Pittsburgh, PA, Gary A. Rosen, Philadelphia, PA, for defendants.

## MEMORANDUM OPINION

LEE, District Judge.

The principal issues addressed herein are whether defendants have violated this Court's preliminary injunction of February 7, 1992, and are therefore in contempt of Court, and if so, the appropriate sanctions for such contempt.

## BACKGROUND

1. The facts relevant to the Order of February 7, 1992, entering the preliminary injunction, are set forth in the 48 Findings of Fact contained in the Memorandum Opinion accompanying the Order,[1] and will not be repeated here except as is necessary to an understanding of the issues now before the Court.

2. Upon consideration of Chief Magistrate Judge Ila Jeanne Sensenich's Recommendation for Disposition of Plaintiff's Motion for Preliminary Injunction, the parties' Objections to that Recommendation, and oral argument, this Court entered a multi-faceted injunction enjoining the defendants, Mrs. Robin F. Woods ("Mrs. Woods") and the Alexander Doll Company ("Alexander") from a variety of activities, a summary of which is as follows:

1. Defendants are enjoined from "characterizing, promoting or advertising" that "any dolls, manufactured by Alexander ... for which [Mrs.] Woods provided any services: (a) are "collectible" ...; (b) may or will increase in value; (c) are part of a "collection" ...; (d) are part of a limited production run ...; (e) are serialized or numbered ...; (f) are accompanied by ...

1. The Memorandum Opinion of February 7, 1992, which has not been published, is incorporated as if set forth fully.

a certificate of authenticity or similar documentation; (g) are signed or otherwise identified with Robin F. Woods; or (h) are only available from an exclusive source at retail or a limited number of sources at retail."

2–6. Defendants are enjoined from promoting the "collection of any dolls ... for which [Mrs.] Woods provided any services"; from "submitting any doll for which [Mrs.] Woods provided any services for any award under any 'collectible' category"; from applying or signing "Robin Woods' name or signature ... to *any* dolls ..."; from "designating or identifying any specific dolls ... for which [Mrs.] Woods provided services"; and Mrs. Woods is prohibited from accepting any awards on behalf of Alexander.

7. Defendants are prohibited from "manufacturing, marketing and selling dolls that are substantially similar to those [specifically named collectible dolls or collections of collectible dolls listed] in Paragraph 12 of this Court's Memorandum Opinion ..."

8. "Defendants, Robin F. Woods and the Alexander Doll Company, are enjoined from identifying Robin F. Woods as having provided any services for any dolls manufactured by any company, including but not limited to the Alexander Doll Company, such as on the product, product tag, box or literature that accompanies the doll or in connection with any advertising or promotion of the doll."

9, 11. Mrs. Woods was also prohibited from attending or appearing at the February 1992 International Toy Fair in New York City, and is prohibited from disclosing customer information which is protected by the Non–Disclosure/Non–Competition Agreement.

10. Defendants are further enjoined from "manufacturing, promoting or selling any dolls ... by reference to the following trademarks of [plaintiff] Robin Woods, Inc.:

(i) the name "Robin Woods";

(ii) the cursive signature "Robin Woods";

(iii) the slogan "A Playmate Today, A Treasure Tomorrow"; and

(iv) the logo with the tree, swing and name Robin Woods.

3. The preliminary injunction is premised upon two separate (but in this case related) legal predicates. The first is the restrictive covenant against competition agreed to between Mrs. Woods and the Company (*see* paragraph 9 of the February 7th Memorandum Order) as part of the consideration for the substantial investment in the Company made by the Pittsburgh Seed Fund, which covenant provides that Mrs. Woods "shall not directly or indirectly provide or render services to ... any other ... organization in connection with products, services and technology which compete, directly or indirectly, with the products and services of the Company (the "Company's Business").... The "Company's Business" is explicitly defined in this agreement as: the "business of manufacturing, marketing and selling *collectible* dolls."

The second predicate arises from the Convertible Term Note Purchase Agreement in which the Company and its principal shareholders, including Mrs. Woods, made certain warranties and representations to the Seed Fund, including that "the Company has all right, title and interest in and to all intangible property ..., including, without limitation, all patents, trademarks, servicemarks, trade names, copyrights, trade secrets, and licenses...." (*See* paragraph 6 of February 7th Memorandum Opinion). Because the personal name "Robin Woods" has acquired a secondary meaning within the doll industry and to the doll buying public, and because at the time of the injunction there was a great likelihood of confusion within the industry and the public as to the source of "Robin Woods" dolls, that trade name and the other trademarks (all unregistered) were entitled to protection under the Lanham Act, 15 U.S.C. § 1125.[2]

---

2. The terms "trade name" and "trademark" are defined in the Lanham Act, and "trademark" includes any "name ... used by a manufacturer or merchant to identify his goods ... and distinguish them from those manufactured or sold by others." 15 U.S.C. § 1127.

4. On February 10, 1992, defendants filed a motion for modification or stay pending appeal, seeking, *inter alia*, to modify the preliminary injunction to permit Mrs. Woods to attend the February 1992 Toy Fair in New York and to permit defendants to identify dolls that Mrs. Woods designs for Alexander. In order to prevent confusion as to the source of "Robin Woods" dolls, defendants sought to modify the injunction to permit defendants to identify Mrs. Woods' dolls designed for Alexander on product tags, boxes, literature and advertising by the notation: "Designed by Mrs. Robin F. Woods for the Alexander Doll Company. Mrs. Woods is no longer affiliated with Robin Woods, Inc." (Motion for Modification or Stay Pending Appeal, paragraph 1(b)). In this motion, defendants argued that the injunction was overly broad and deprived Mrs. Woods of her right to use and preserve her "considerable reputation as a designer of play dolls." *Id.*, paragraph 3.

5. Following argument on this motion, the Court denied modification of the injunction or stay pending appeal, stating: "*Under the present state of the record*, this Court does not believe a modification ... is appropriate.... Robin Woods, Inc. is entitled to protection *of its collectible doll market*, and a modification or stay of the Order would dilute that protection." (Memorandum Order, February 11, 1992).

6. Defendants then filed an emergency application for stay or modification of preliminary injunction pending appeal with the United States Court of Appeals for the Third Circuit. This emergency application was denied initially by a Circuit Judge, and that denial was affirmed by a panel of the Circuit Court. Defendants also filed a timely appeal from this Court's February 7th Order, entering the preliminary injunction which a panel of the Third Circuit Court of Appeals af-

firmed on August 31, 1992, 975 F.2d 1551 (3rd Cir.1992).

### THE MOTION FOR CONTEMPT

7. On June 11, 1992, plaintiff filed the matter currently before this Court,[3] its motion for contempt, counsel fees, expenses, damages and other sanctions. (Document No. 57). Plaintiff's motion for contempt, etc., claims defendants wilfully violated this Court's February 7th Order, by their conduct in promoting and advertising a new 1992 line of dolls for Alexander, "Let's Play Dolls," a line designed by Mrs. Woods and promoted under her nom de plume "Alice Darling."[4] The motion for contempt alleges that Mrs. Woods had already appeared and is further scheduled to appear as "Alice Darling" at trade shows, retail shows and other events promoting the "Let's Play Dolls" line for Alexander, and that defendants' promotional campaign includes photographs, literature and advertisements announcing that "Mrs. Robin F. Woods is exclusively associated with the 'Let's Play Dolls' division" of Alexander and "will be creating dolls for play under the name 'Alice Darling.'" The promotional material included advertisements in the July 1992 issues of *Doll Reader* (Plaintiff's Exhibit 10) and *Dolls—The Collector's Magazine* (Plaintiff's Exhibit 9) which featured Mrs. Woods' photograph and stated, in part, that Mrs. Woods resigned from the Company in December 1991, that a federal court "preliminarily ruled that [the Company] owns the trade name Robin Woods, and that Mrs. Woods may not use her name to identify any dolls which she designs. Accordingly, Mrs. Woods has assumed a new trade name, Alice Darling, to identify the dolls she designs for the Alexander Doll Company." (This advertisement, which also was reproduced as a poster at trade shows in March and April 1992, has been reproduced and is attached to this Memorandum Opinion as an Appendix.) Plaintiff asserts that de-

---

3. By Order of September 22, 1992, this Court affirmed Chief Magistrate Judge Sensenich's ruling that a Magistrate Judge does not, absent the consent of the parties, have jurisdiction to conduct evidentiary hearing and resolve disputes in civil contempt proceedings. *See Taberer v. Armstrong World Indus., Inc.*, 954 F.2d 888 (3d Cir. 1992).

4. Mrs. Woods testified at the contempt hearing that she selected this name as an amalgam of "Alice" (from "Alice in Wonderland") and "Darling" (from Wendy Darling in "Peter Pan").

fendants' conduct "advised and continues to advise the retailers and collectors and the entire world that Mrs. Woods" is designing the "Let's Play Dolls" line as "Alice Darling" for Alexander, in violation of this Court's preliminary injunction. (Motion for Contempt, etc., paragraph 10).

8. Additionally, plaintiff asserts that the "Let's Play Dolls" line of dolls is "identical to or substantially similar" to its line of collectible dolls, and that defendants are therefore in contempt of court for violating those portions of the preliminary injunction prohibiting Mrs. Woods from designing, and both defendants from promoting, advertising or encouraging collection of, *collectible* dolls, and otherwise competing against the Company in the *collectible* doll market.

9. Plaintiff seeks a wide-range of relief, including that Mrs. Woods be prohibited from working for or being paid by Alexander for any services, that defendants be prohibited from distributing any additional literature or advertising about "Let's Play Dolls," and be required to recall all such previously distributed material along with the entire line of dolls, and that defendants be fined and reimburse plaintiff for a variety of asserted damages.

10. The parties have submitted proposed Findings of Fact and Conclusions of Law.[5] (Document Nos. 125, 127, 129, 130)

## FINDINGS OF FACT

The following findings of fact have been demonstrated by clear and convincing evidence of record by way of documentary and testimonial evidence produced in these contempt proceedings.

## A. CONTEMPT

11. Mrs. Woods attended the Toy Fair in New York City in February 1992 on behalf of Alexander, and was present at their "Let's Play Dolls" booth, but only until plaintiff posted a bond pursuant to Fed.R.Civ.P. 65 on or about February 11, 1992. At that point, Mrs. Woods left the Toy Fair and did not return.

12. At the Toy Fair, Mrs. Woods discussed the fact she had resigned from the Company and was designing the "Let's Play Dolls" line for Alexander. However, there is no evidence or indication that she disparaged the Company or its product and, in fact, she encouraged at least one dissatisfied Company customer to keep her appointment with the Company's representatives and to order its product if she (the customer) liked what she saw.[6]

13. The "Let's Play Dolls" line consists of twenty-eight dolls grouped into six play themes, "Sing Me A Song," "Let's Pretend," "Thank Heaven For Little Girls," "Day By Day," "Tell Me A Story," and "Best Friends." The "Let's Play Dolls" catalogue explains this line represents "a new concept in dolls for children.... Designed to encourage imaginative play ... these dolls embody the magic of that special bond between a little girl and her doll." (Plaintiff's Contempt Exhibit 11; Defendants' Exhibit L). A major feature of this line of dolls is the separately sold, interchangeable outfits (*e.g.*, Day By Day Fashions) and accessories (*e.g.*, trunks and hat box). The suggested retail price range of these "Alice Darling" dolls is $79.95—$149.95. *Id.*

14. Mrs. Woods was "emotionally devastated" by this Court's February 7th Order prohibiting her from using her own name in the doll industry, and she conferred with Mr. Ira Smith, Alexander's President and consulted with their attorneys regarding how she could remain in the doll market as a designer of play dolls and continue to use her evident talent and her substantial personal reputation without violating the injunction.

5. As of this date, the record has not been transcribed.

6. The Court finds Mrs. Woods' testimony credible. Her credibility in this regard is bolstered by the fact that it was, and still is, in her best interests to see the Company remain a viable producer of collectible dolls inasmuch as she remains a shareholder of about 7% of the Company's stock and, along with her husband, has personally guaranteed $900,000.00 of loans to the Company. (Mem.Op., February 7, 1992, at paragraphs 1, 27).

(Deposition of Mr. John H. Bingler, Jr., Esquire, October 26, 1992 (Document No. 123).[7]

15. Initially, the "Let's Play Dolls" promotional campaign featured personal appearances by Mrs. Woods at trade shows (in Dallas, Texas, in March 1992 and Pomona, California, in early April 1992) and at various regional "trunk shows" for retailers throughout the country in April, May and June, 1992; at these appearances, promotional material was displayed or distributed, which included the photograph of Mrs. Woods as "Alice Darling" and the excerpted text set forth in Paragraph 7 herein. (*See* Appendix).

16. There is no evidence of record that Mrs. Woods' completed or scheduled personal appearances involved or will involve any use or application of the cursive signature "Robin Woods," the slogan, "A Playmate Today, A Treasure Tomorrow," or the logo with the tree, swing and the name, "Robin Woods." Further, there is no evidence that she used the name "Robin Woods" at these appearances, that she identified the name "Robin Woods" with any Alexander dolls, that she signed any dolls, or that she promoted or sold "Let's Play Dolls" as anyone other than "Alice Darling," *except* to the extent that retailers were informed by a variety of promotional literature (retailer-directed press kits, doll magazine advertisements and posters) that Mrs. Woods was no longer employed by the Company and was designing "Let's Play Dolls" for Alexander as "Alice Darling." That promotional campaign did identify Mrs. Woods with the "Let's Play Dolls" line as its designer.

17. Defendants' promotional campaign has been successful in that "everybody" in the doll industry is aware that "Alice Darling" is Mrs. Robin F. Woods. (Testimony of Mr. A. Glenn Mandeville, defendants' expert witness, October 21, 1992.) Not all retail customers are aware that "Alice Darling" is Mrs. Woods.

18. Alexander has submitted certain "Let's Play Dolls" dolls for "DOTY" (Doll of the Year) awards, namely "Libby" in the "premium price baby toddler doll category," and "Alice, Darling Alice" and "Lassie" in the "premium price fashion doll category." To be nominated in these categories, dolls must satisfy all nominating criteria as determined by a panel of doll experts. The principal criterion for these "play" categories for which "Let's Play Dolls" dolls were nominated is that the dolls be marketed primarily for children.

19. As this Court found in its February 7th Memorandum Opinion, many premium priced dolls share elements of "play" dolls and elements of "collectible" dolls, and it is the purchaser who ultimately determines whether her or his purchase of a doll is for collection or for play. (*See* Memorandum Opinion, paragraphs 10, 12, 23, 40, 43). Like beauty, doll collectibility is a quality very much in the eye of the beholder.

20. Nevertheless, it is clear from all of the credible evidence offered at the contempt hearing, (including that of Mrs. Woods; Mr. A. Glenn Mandeville, a preeminent historian, author, editor and expert in the doll industry, whose testimony this Court finds quite illuminating and impressive; Mrs. Glenda Jackson, owner of a retail specialty doll shop selling both collectible and play dolls in Alabama; Mr. William Davidson, senior buyer of toy merchandise for Walt Disney Attractions, Inc., in Orlando, Florida; Ms. Carol Moody, owner of a retail specialty doll shop selling both collectible and play dolls in Arlington, Texas; and Ms. Kay Hyatt, owner of a retail specialty play and collectible doll shop in Pennsylvania), that the "Alice Darling—Let's Play Dolls" line is *in fact* being promoted, marketed and advertised *exclusively* as play dolls that are suitable and appropriate for play by children. Nothing in the promotion of "Let's Play Dolls" is targeted or designed to appeal to or attract collectors. Additionally, there is clear and convincing record evidence that the dolls of the "Let's Play Dolls" line are, *in fact*, being purchased primarily by mothers and grandmothers for their daughters and granddaughters to play with, and plaintiff offered no competent evidence that "Let's Play Dolls" dolls were being purchased and used by collectors.

7. Mr. Bingler has represented defendants throughout these proceedings, but withdrew as counsel from the contempt proceedings when defendants decided to offer his testimony.

21. Plaintiff offered expert testimony by its Vice President of Sales and Marketing, Mr. William Greenman, as to numerous characteristics of the Company's dolls designed by Mrs. Woods that are shared, in his opinion, with the "Let's Play Dolls" line of dolls. This Court agrees with plaintiff, and finds as a fact, that the respective "Robin Woods" and "Alice Darling" dolls share *certain* characteristics, including: Kankekelon wigs, hand-painted eyes, matching accessories, advertising in *Doll Reader* and *Dolls—The Collector's Magazine*, promotion by personal appearances by Mrs. Woods (as "Alice Darling" for "Let's Play Dolls"), high quality materials and craftsmanship, both lines have both collectible and play features, both lines have poseable heads, arms and legs and are rotationally molded, and both lines of dolls are grouped by themes.

22. Defendants' expert and fact witnesses testified, however, as to numerous substantial and significant differences between the two lines of dolls, and the Court finds numerous differences exist, chief among them being as follows:

(A) Unlike the Company's collectible dolls, the dolls of the "Let's Play Dolls" line feature *fully* jointed, more flexible and movable arms and legs that are much easier to pose and bend into a variety of positions; this flexibility allows a child to dress and undress these dolls much more easily than the Company's dolls and encourages play;

(B) The plastic used in the "Let's Play Dolls" line is softer and more supple than the material used for the bodies and faces of the Company's dolls, again encouraging and fostering play;

(C) The hands of the "Let's Play Dolls" dolls are shaped differently than those of the Company's dolls, and can be more readily positioned to hold garments and accessories and to "hold" children's hands;

(D) Underwear is a critical item in determining the collectibility of dolls; a doll's underwear is one of the first things that a collector looks at in selecting a doll, and the more elaborate the undergarments, the more collectible; "Let's Play Dolls" underwear is less elaborate than the underwear placed on the Company's dolls;

(E) The themes for the groupings of the Company's dolls tended to be historical and literary themes (such as the Alcott Collection and the Camelot Collection), while the themes embodied in groups of "Let's Play Dolls" are divided into "several natural themes of early childhood" such as "Day–By–Day," "Sing Me a Song," and "Let's Pretend";

(F) The dolls in the "Let's Play Dolls" line come with numerous outfits and accessories that can be purchased separately and which encourage children to change, dress and undress these dolls frequently, while the Company's collectibles are self-contained units whose elaborate costuming is designed to remain intact;

(G) *Marketing:*

(1) As set forth in the Memorandum Opinion of February 7, 1992, the Company made a conscious decision to move away from play dolls and toward the marketing and sale of collectible dolls by adults, deemphasized the play potential of its dolls and started referring to itself as "The Collectible Doll Company." (Memorandum Opinion, paragraph 23);

(2) On the other hand, the "Let's Play Dolls" marketing concept is explicitly designed to encourage purchasers to buy these dolls for children to be played with and touched.

(H) The price range for "Let's Play Dolls" is approximately $80.00 to $150.00 retail; the typical "collectible" for the Company ranges from $150.00 to $250.00, but the Company markets dolls ranging from $100.00 to $700.00.

23. The Court further finds that many of the admittedly similar features of the dolls, such as hand-painted faces, Kankekelon wigs and poseable heads, are features that are shared by most premium priced play or collectible dolls, and are not, therefore, particularly distinctive features.

24. In addition to the testimony of the fact and expert witnesses, the Court has had the opportunity to examine the many physical exhibits, including the dolls introduced at

the hearings on both the motion for preliminary injunction and the contempt motion.[8]

25. Plaintiff alleges that defendants have designed, marketed and sold "exclusives" for Walt Disney World and for Nieman Marcus in violation and contempt of paragraph (1)(h) of this Court's injunction. However, that portion of the injunction only prohibits defendants from characterizing, promoting or advertising that "any *dolls* manufactured by Alexander Doll Company for which Robin F. Woods provided any services ... are only available from an exclusive source at retail or from a limited number of sources at retail." Although certain Nieman Marcus and Walt Disney World advertisements could *possibly* be read to support an inference that Mrs. Woods designed exclusive dolls for those businesses, in fact she only designed exclusive or limited edition costumes or accessories (hats) that could be used on and with *any* "Let's Play Dolls" doll. The injunction does not prohibit defendants from designing and marketing exclusive costumes and accessories. Any "exclusive *doll*" inference arising from the possibly misleading advertisements were prepared and authorized by Walt Disney World and Nieman Marcus, and did not arise from defendants' conduct.

## B. ALLEGED DAMAGES

26. In its motion for contempt, etc., plaintiff claims it has been severely damaged by defendants' violations of the injunction, which have caused plaintiff the loss of "significant amounts of business," loss of goodwill, "loss or erosion of its client base," substantial legal expense in obtaining the injunction and attempting to enforce it, and expenditure of management time in preparation for litigation. In the joint pre-trial stipulation filed by the parties on October 2, 1992 (Document No. 92), plaintiff generally alludes to some seventeen categories of damages without specification of amounts or identification of the manner of calculation of damages.[9]

27. Prior to the contempt hearings, defendants filed a motion to strike damage claims (Document No. 95), and a motion for summary judgment with respect to the damage claims (Document No. 102). The motion to strike is predicated on plaintiff's asserted failure to comply with this Court's 5.II Order of September 21, 1992 (Local Rule 5.II.D) in failing to set forth an itemized statement of claim for special damages "together with the substance of the evidence to be introduced in support of such claims, the method of calculation of such items, the method of proof of loss of future earning power, future support or maintenance, and the method of reduction to present worth ..." Defendants argue summary judgment is "appropriate at this time because the evidence of record proves that [the Company's] decline in orders could have been caused by any number of factors. At best [the Company], has only circumstantial evidence that defendants' allegedly contemp-

---

8. At the hearing on the motion for contempt, plaintiff offered into evidence Exhibit 104, a photo album compiled by Mr. William Greenman containing photographs of dolls manufactured by the Company and designed by Mrs. Woods and of dolls in the "Let's Play Dolls" line. Mr. Greenman referred to this Exhibit to illustrate asserted similarities between the dolls. Defendants' witnesses, including Mr. Mandeville, referred to Exhibit 104 at length to illustrate the differences (or lack of similarity) between the respective lines of dolls. Defendants objected to Exhibit 104 at the hearing and have renewed their objection on relevancy grounds in their motion to strike plaintiff's Exhibit 104 (Document No. 120). This motion to strike will be denied; although Exhibit 104 does contain photographs of certain dolls that were not among those dolls specifically identified previously by this Court as "collectible," defendants' objection goes more to the evidentiary value of Exhibit 104 than to its admissibility.

9. Plaintiff's pre-trial stipulation lists the following items of damages:

Legal expenses (expenses incurred in obtaining the Order granting a Preliminary Injunction which has been violated, and expenses incurred in enforcing the February 7, 1992, Order); Management expenses (expenses incurred by management in assisting counsel in preparing for court and depositions); Lost sales (present sales); lost future sales; loss of market share; loss of good will; expenses associated with developing and promoting a new designer; expenses for additional advertising; cost and legal fees associated with defending against lawsuits which have resulted from plaintiff's loss of business and inability to pay its creditors; loss of key personnel and replacement costs for these key personnel; lost customers; lost profits; damage to vendor relationships, damage to banking relationships, damage to employee morale, and loss of retailer and customer trust and loyalty.

tuous conduct caused the decrease in orders," (Document No. 102 at 3), and that plaintiff has not identified any exhibits or witnesses which can prove that defendants' conduct has caused plaintiff's damages at the contempt hearing.

28. Plaintiff's "itemization" of damages in its pre-trial stipulation comes dangerously close to failing to comply with the Court's 5.II Order. However, that "itemization" was buttressed by plaintiff's submission of its expert's report by Mr. Roman Iwanyshyn on October 13, 1992 (Document No. 98). Although this report is not a model for compliance with this Court's 5.II Orders regarding damages, and arguably fails to supply some of the information required by Rule 5.II, the Court finds that plaintiff had complied (albeit minimally) with the 5.II Order, and had submitted barely adequate documentation to survive defendants' motion to strike damages claim and motion for summary judgment with respect to damages. What was implicit before is now made explicit, and this Court will deny defendants' motions to strike damages claim and for summary judgment with respect to damages.

29. Plaintiff offered three witnesses in support of its damages claims:

(A) *William Greenman*—Mr. Greenman testified as to damages he believes have been caused by defendants' violation of the injunction, both as a fact witness and as an expert witness.[10] Greenman testified that the Company was not invited to the Walt Disney World Showcase of Dolls extravaganza for December 1992, because Mrs. Woods was no longer associated with the Company. (Walt Disney World was the largest single purchaser of the Company's dolls in 1991.) Mr. Greenman testified as to a drastic drop in orders and sales in the Company's product in 1991; the Company's orders for January 1991 were $1.5 million, whereas their orders for January 1992 amounted to $300,000, a decline of some 80%. Greenman attributed this drop in sales/orders to confusion by retailers as to the source of "Robin Woods"

dolls, in that retailers were aware that Mrs. Woods was designing dolls for Alexander.

(B) *David Lamont*—Mr. Lamont is the chief financial officer for the Company and has worked for plaintiff since May 1991. A professor at Carnegie–Mellon University, Mr. Lamont holds several engineering and business degrees and his experience appears to be primarily in academics, although he previously consulted for some small businesses prior to joining the Company in May 1991. Mr. Lamont also testified as both a fact and an expert witness. (*See* note 9). Lamont testified to an 85% drop in sales/orders from December 1991 to October 1992. He attributed this loss of business to two factors: the first was that Mrs. Woods was no longer designing for the Company, which contributed to loss of customers; the second was that, in his opinion, there was now another source for Mrs. Woods' products in the marketplace, namely, her new line of dolls being designed for Alexander.

(C) *Roman Iwanyshyn*—Mr. Iwanyshyn, a certified public accountant, attorney and appraiser, testified strictly as an expert witness. Mr. Iwanyshyn's testimony was essentially consistent with his expert report, which concluded, *inter alia*, that: the Company suffered a decline in gross sales of approximately $1.8 million from February 1992 through August 1992; the Company experienced a decline in gross new orders during that same period of approximately $3.1 million; the Company sustained a decline in its gross profit margin from approximately 36% in 1991 to 15% during that period; the Company's profit loss before interest and taxes between February and the end of August 1992 was approximately $408,000 compared to the comparable period in 1991, and the profit loss for September 1992, as compared to September 1991, was approximately $80,-000, for a total gross profit loss during the contempt period through the end of September 1992, of approximately $488,000. Mr. Iwanyshyn's expert opinion was formed primarily from review of the Company's "internally-generated financial statements" and in-

---

10. Both Mr. Greenman and Mr. David Lamont, the plaintiff's chief financial officer, were permitted to testify as "experts" under the auspices of

*Teen–Ed v. Kimball Int'l.*, 620 F.2d 399 (3d Cir. 1980), although this was a close question. *Cf. Eisenberg v. Gagnon*, 766 F.2d 770 (3d Cir.1985).

terviews with the Company's officers and employees. Over objection to his qualifications as an expert witness with regard to the cause of plaintiff's losses,[11] Mr. Iwanyshyn testified that, in his opinion, the decline was caused by "unanticipated competition" from Alexander and Mrs. Woods.

30. It is beyond dispute, however, and is in fact the law of the case,[12] that the Company was already losing substantial amounts of orders and sales in 1991, and that causes other than Mrs. Woods' departure from the Company caused those losses. This Court's February 7th Memorandum Opinion makes the following findings of fact:

(18) In the summer of 1990, over Mrs. Woods' objections, the Company shipped dolls that it knew had been manufactured with defective plastic parts which caused the heads of the dolls to fall off in their boxes;

(19) In 1991, the Company made a decision to offer its dolls to consumers at a discount by marketing and selling them on the Home Shopping Channel and on QVC, television programs which promote the sales of retail items at discount prices, and this discounting angered many of the Company's retailers who had been required to sign an agreement that they would not discount the dolls;

(20) In an attempt to reduce the production costs of its dolls designed by Mrs. Woods, the Company removed many of the design characteristics and changed many of the fabrics. Mrs. Woods felt that this produced an inferior product which detracted from their quality and value.

. . . . .

(24) During the year 1990, the Company suffered a loss of $370,000, partially due to a write off of inventory.

(25) In 1991, the price of the Company's dolls was raised substantially because of the cost of production, and sales dropped dramatically.

31. Defendants introduced impressive evidence that the cause of the plaintiff's damages was not due to the "competition" from "Let's Play Dolls," but was in fact a result of plaintiff shooting itself in the foot with its change in marketing strategies, its decision to discount its dolls and its mishandling of customer relations. Convincing evidence in this regard was presented by doll industry expert Mandeville and the specialty retail doll shop owners who testified on defendants' behalf.[13]

32. Mr. Mandeville's testimony was most persuasive on the issue of whether "Let's Play Dolls" were substantially similar to the collectible dolls made by the Company. His unqualified professional opinion was that the dolls in the "Let's Play Dolls" line were "unquestionably play dolls," and this opinion was fully supported by the testimony of defendants' other witnesses and by the promotional materials disseminated with distribution of the "Let's Play Dolls" line. The Court finds that the dolls in the "Let's Play Dolls" line are play dolls, not "collectible" dolls as this Court has defined and illustrated that term of art, and therefore, any damage that plaintiff has sustained has not been the cause of any "unanticipated competition" because the respective lines simply do not compete. Although it is, of course, possible that some purchasers will collect dolls from the "Let's Play Dolls" line (just as some people collect the much less expensive "Barbie" dolls), this does not render the dolls "collect-

---

11. This Court overruled the objection and permitted Mr. Iwanyshyn to render expert testimony under the very liberal standards for qualification of an expert witness set forth in *Hines v. Consolidated Rail*, 926 F.2d 262 (3d Cir.1991), and *Knight v. Otis Elevator Co.*, 596 F.2d 84 (3d Cir.1979).

12. *See United States v. Local 560, Int'l. Bhd. of Teamsters (I.B.T.)*, 974 F.2d 315, 329–30 (3d Cir. 1992).

13. Plaintiff attempted to adduce evidence from other retailers by way of hearsay statements that were included on printouts prepared by Company employees in its marketing division. Plaintiff sought to justify admission of this hearsay as market reports, F.R.Evid.R. 803(17), and otherwise as coming within the business record exception, F.R.Evid.R. 803(6). The Court sustained defendants' objection to this hearsay information which is not within the exceptions to the rules relied upon by plaintiff.

ible," nor does the fact that "Alice Darling" promotes "Let's Play Dolls" by personal appearances.

33. Ms. Hyatt, the retailer from Grove City, Pennsylvania, who deals in play and collectible dolls, testified that she ordered between $45,000 and $60,000 worth of the Company's dolls at the New York Toy Fair in 1991, and only about $5,000 in 1992. She received some of the dolls from her 1992 order but was dissatisfied, returned them and canceled the rest of her order. Ms. Hyatt was angered by the Company's change in marketing structure, including that the Company is now offering dolls at discount prices on QVC, even though retailers were required to sign statements at the 1991 Toy Fair that they would not sell the Company's dolls for less than twice the wholesale price. Members of the Robin Woods Doll Club were also angered by the Company's decision to sell, on the open market, dolls that were supposedly exclusive to club members. Ms. Hyatt was also offended by a letter she received from Mr. Thomas N. Canfield, President and CEO for the Company, dated July 15, 1992, which informed Ms. Hyatt that the Court's Order of February 7, 1992, was "binding upon you. If you assist Mrs. Woods and the Alexander Doll Company in violating the Court Order, we may look to you for damages." (Defendants' Exhibit UU). This retailer felt threatened by this letter.

34. Mrs. Jackson, the play and collectible doll retailer from Alabama, testified that her customers were no longer interested in buying the Company's new dolls at such high prices ($100 to $700) knowing that Mrs. Robin F. Woods did not design them. She further testified she decided not to buy any more of the Company's dolls for reasons similar to those testified to by Ms. Hyatt. Additionally, Mrs. Jackson was overstocked in 1992 with the Company's inventory, and was skeptical about participating in the Company's new coupon redemption program wherein purchasers of the Company's dolls would receive coupons for purchases of dolls in the future, because she was aware that the Company had cash flow problems and might go out of business. Mrs. Jackson believed that this coupon program "ruined her Robin Woods, Inc., business."

35. The deposition testimony of Ms. Carol R. Moody was also introduced on behalf of the defendants. (Defendants' Exhibit VV). Mrs. Moody testified that she did not place an order for the Company's dolls at the 1992 Toy Fair in New York primarily because she was disappointed in the lack of concept or diminishment of concept and the quality of its 1992 line. For example, the underclothing was not up to "collectible" standards. Mrs. Moody also received a letter from Mr. Canfield on June 26, 1992, which informed her that the Court's injunction was binding on her and "If you assist Mrs. Woods and the Alexander Doll Company in violating the Court Order, we may look to you for damages." The witness was irritated by the threatening tone of this letter and she called Mr. Canfield to discuss it. Mr. Canfield never returned the call, her confidence in the Company was shaken, and she decided not to continue doing business with the Company at that time.

36. The deposition testimony of Mr. William Davidson, senior buyer of dolls for Walt Disney World (Document No. 122) established Disney purchased $200,000 worth of dolls from the Company in 1991, but did not place a purchase order in 1992. The principal reasons were that he was overstocked with the Company's dolls which did not sell as well as he had anticipated, the Company's dolls were now overpriced, having experienced a "tremendous price increase in 1991," and the Company started discounting their dolls on hand at half price, which drastically impaired Disney's ability to sell its stock of the Company's dolls.

37. *Attorneys' Fees*—Plaintiff submitted an affidavit (Document No. 118) representing that the "charges for legal services and disbursements through September 30, 1992, are $84,897.15 consisting of $16,846.24 for the appeal and $68,050.91 for the (contempt) litigation...." Additionally, plaintiff submitted a supplemental affidavit (Document No. 128) for legal services in connection with the contempt litigation subsequent to September 30, 1992, in the amount of approximately $30,000.00. Defendants' reply to the affidavit of

plaintiff's attorney (Document No. 126) does not dispute the reasonableness of the hourly fees and expenses claimed by plaintiff, but disputes plaintiff's right to recover any portion of those fees related to the appeal of the preliminary injunction or to counsel familiarizing themselves with the file obtained from plaintiff's former counsel who successfully obtained the preliminary injunction. Defendants also claim there are several inaccuracies in computation of the total amount of legal fees according to plaintiff's counsel's own invoices.

## C. ULTIMATE FINDINGS

38. Currently, there is no likelihood that the introduction of the "Let's Play Dolls" line of dolls into the market in 1992 has caused or will cause confusion among retailers or ultimate purchasers of play and collectible dolls. There is only one source of "collectible" dolls designed by Mrs. Robin F. Woods, namely the Company. There is only one source of play dolls designed by Mrs. Woods (under the nom de plume, "Alice Darling"), namely the "Let's Play Dolls" line for the Alexander Doll Company.

39. There has been no appropriation by defendants of the goodwill of the Company that is associated with the trade name "Robin Woods" and the other protected "Robin Woods" trademarks, nor was defendants' promotional campaign for "Let's Play Dolls" designed or intended to accomplish this purpose. To the contrary, the promotional campaign was designed to allow Mrs. Woods to retain and take advantage of her personal reputation as a designer of high quality play dolls.

40. The dolls designed by Mrs. Woods for the "Let's Play Dolls" line are not "collectible" and are not "substantially similar" to those dolls identified as collectible dolls in this Court's Order of February 7, 1992.

41. Defendants have violated this Court's Order of February 7, 1992, in the following particulars:

(A) Paragraph 1(g)—Defendants promoted and advertised that dolls manufactured by Alexander were designed by Mrs. Woods by identifying "Alice Darling" as Mrs. Woods and as the designer of "Let's Play Dolls";

(B) Paragraph 5—Defendants, by their promotional campaign, designated or identified specific dolls manufactured by Alexander for which Mrs. Woods provided services;

(C) Paragraph 8—Defendants identified Mrs. Woods as having provided services for the dolls of the "Let's Play Dolls" line on the "literature that accompanies the doll or in connection with any advertising or promotion of the doll."

42. In all other respects, defendants have not violated the Court's injunction.[14]

## CONCLUSIONS OF LAW

■ 1. Civil contempt is committed when a person violates an order of court which requires that person in specific and definite language to do or refrain from doing an act or series of acts. *Lichtenstein v. Lichtenstein*, 425 F.2d 1111, 112 (3d Cir.1970).

■ 2. The plaintiff has a heavy burden of showing the defendants are guilty of civil contempt of a court order; defendant's contempt must be demonstrated by clear and convincing evidence, and where there is some reasonable basis upon which to doubt the wrongfulness of defendants' conduct, they should not be adjudged in contempt. *American Greetings Corp. v. Dan–Dee Imports*, 807 F.2d 1136, 1140 (3d Cir.1986); *Quinter v. Volkswagen of America*, 676 F.2d 969, 974 (3d Cir.1982); *Cottman Transmission Systems v. Metro Distributing*, 1992 WL 279269, *4, 1992 U.S.Dist. LEXIS 15167, * 12 (E.D.Pa.1992).

3. With respect to those portions of the preliminary injunction based upon the restrictive covenant prohibiting Mrs. Woods from competing with the Company in the collectible doll market, this Court holds that plaintiff has failed to sustain its burden of proving, by clear and convincing evidence, that defendants have violated the order of February 7, 1992. To the contrary, the rec-

---

14. Although Mrs. Woods attended the Toy Fair in New York City in 1992, she left the fair immedi-ately upon the posting of the injunction bond by plaintiff.

ord evidence clearly demonstrates that any competition created by the "Alice Darling"— "Let's Play Dolls" line is in the play doll market. Such competition is prohibited neither by agreement of the parties nor by any of the terms of the preliminary injunction.

4. With respect to those portions of the preliminary injunction based upon plaintiff's rights acquired under the terms of the Convertible Term Note Purchase Agreement and the Lanham Act, defendants have violated certain provisions of the preliminary injunction, namely paragraphs 1(g), 5 and 8. In all other respects, defendants have complied with the preliminary injunction order.

■ 5. Structuring the civil contempt sanctions to be imposed for violation of the injunction by identifying Mrs. Woods as having designed the "Let's Play Dolls" line for Alexander in defendants' promotional material, it is appropriate to seek guidance from the Lanham Act. *Howard Johnson Co., v. Khimani*, 892 F.2d 1512, 1519 (11th Cir.1990); *Winterland Concessions Co. v. Brandt*, 1992 WL 170897, 1992 U.S.Dist. LEXIS 9917 (E.D.Pa.1992). Under the Lanham Act, a plaintiff whose trademark rights have been violated may be entitled to recover defendants' profits, any actual damages to plaintiff (which may be trebled) and costs of the action, including attorneys' fees in "exceptional" cases. 15 U.S.C. § 1117(a); *Howard Johnson*, 892 F.2d at 1519; *Knorr–Nahrmittel A.G. v. Reese Finer Foods, Inc.*, 695 F.Supp. 787, 794 (D.N.J.1988).

■ 6. The district court's discretion in imposing compensatory damages in civil contempt proceedings is "particularly broad," and may include disgorgement of defendants' profits in addition to plaintiff's actual damages. *Howard Johnson*, 892 F.2d at 1521. In a civil contempt proceeding occasioned by willful disobedience of a court order, the court also may award attorneys' fees as well as the costs of investigating the violation of the order and conducting and preparing for the contempt proceeding. *Ranco Indus. Products Corp. v. Dunlap*, 776 F.2d 1135, 1139 (3d Cir.1985); *Quinter*, 676 F.2d at 974;

*Int'l Bhd. of Teamsters, Local 249 v. Western Pennsylvania Motor Carriers Ass'n.*, 660 F.2d 76, 84 (3d Cir.1981); *Winterland Concessions*, 1992 WL 170897, * 10, 1992 U.S.Dist. LEXIS 9917, * 24, citing, *inter alia, Vuitton et. Fils, S.A. v. Carousel Handbags*, 592 F.2d 126, 130–31 (2d Cir.1979).

■ 8. Where the plaintiff's injury is of such nature as to preclude precise measurement of the amount of damage sustained, as will often be the case where the defendant violates a preliminary injunction,[15] it is "enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Howard Johnson*, 892 F.2d at 1520, quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). However, although reasonable approximation may suffice as to ascertainment of the *amount* of damage, the plaintiff must demonstrate that, in fact, the defendants' contempt *actually caused* the injuries complained of. *Advent Systems Ltd. v. Unisys Corp.*, 925 F.2d 670, 681 (3d Cir.1991). (The court "emphasize[d] the need for evidence sufficiently concrete to provide a reasonable degree of certainty" that an award of damages "is more than the result of a lottery or emotional reaction.")

9. In determining the sanctions to impose for defendants' contempt in this case, it is appropriate for the Court to consider the purpose of the injunction in light of the protections afforded by the Lanham Act, and to weigh defendants' post-injunction conduct in that light.

■ 10. Under the Lanham Act, as well as the common law, owners of trademarks are protected from other marks that are likely to cause confusion. *Scott Paper Co. v. Scott's Liquid Gold*, 589 F.2d 1225, 1228 (3d Cir.1978). Trademark law focuses on the consuming public, *Premier Dental Products Co. v. Darby Dental Supply Co.*, 794 F.2d 850, 856 (3d Cir.1986), and the "basic issue in a trademark infringement action under both the Lanham Act and the

**15.** A preliminary injunction will only issue upon a finding that it is necessary to prevent irreparable harm to the plaintiff, which will often be demonstrated where plaintiff's damages will likely be difficult to ascertain. *See Campbell Soup v. Conagra, Inc.*, 977 F.2d 86, 91 (3d Cir.1992).

common law" is the likelihood that consumers will be misled and confused by the trademark infringement as to the origin or sponsorship of the goods or services consumed. *Scott v. Mego International, Inc.,* 519 F.Supp. 1118, 1128 (D.Minn.1981) (collecting cases). The Third Circuit has observed that trademark law "is not made for the protection of the experts but for the public—that vast multitude, which includes the ignorant, the unthinking and the credulous, who, in making purchases, do not stop to analyze but are governed by appearances and general impressions." *Dresser Indus., Inc. v. Heraeus Engelhard Vacuum, Inc.,* 395 F.2d 457, 462 (3d Cir.1968).

11. Considering the character of the product, the use to which it is put, the manner in which it is marketed and purchased, and the class of buyers and level of their sophistication, the district court must determine whether the plaintiff has proven the buying public is likely to confuse defendant's goods with plaintiff's. *Id.*

12. Under the circumstances existing as of February 7, 1992, there was a likelihood of confusion as to the source of "Robin Woods" dolls, given the uncertainty in the industry and among consumers *at that time* over Mrs. Woods' affiliations and as to whether she would be designing collectible, play or both kinds of dolls for the Company or Alexander or both. (Memorandum Opinion, paragraph 17).

*Personal Names as Trademarks*

13. Earlier in our jurisprudence, it was considered one's "sacred right" to use one's personal name in connection with his or her business, despite the existence of other businesses operating under that same name. Mandell, *Personal Name Trademarks—Your Name May Not Be Your Own,* 70 TMR 326, 327 1980); *Basile, S.P.A. v. Basile,* 899 F.2d 35, 38 (D.C.Cir.1990).[16] Today, courts treat disputes involving personal name trademarks

in much the same way as any other trademark dispute. McCarthy, *Trademarks and Unfair Competition,* Ch. 13, Personal Names as Marks, Section 13.3 (2d Ed.1984). The court will determine whether the name has developed a secondary meaning and, if so, whether defendants' use of the personal name as a trademark is likely to deceive or to cause confusion with plaintiff's prior use of the same name. *Mandell,* 70 TMR at 328 (*and see* cases cited therein). If confusion is likely, the courts will fashion an appropriate decree. *See L.E. Waterman Co. v. Modern Pen Co.,* 235 U.S. 88, 94, 35 S.Ct. 91, 92, 59 L.Ed. 142 (1914) (Holmes, J., stating, "When the use of his own name upon his goods by a later competitor will and does lead the public to understand that those goods are the product of a concern already established and well known under that name, and when the profit of the confusion is known to and, if that be material, is intended by the later man, the law will require him to take reasonable precautions to prevent the mistake.")

14. Certain nuances accompany the personal-name-as-trademark cases, and "easy solutions cannot always be fashioned for problems generated by use of a personal name, particularly since an emotional factor is often involved." *Mandell,* 70 TMR at 337. Where more than one person or company has a legitimate claim to a given personal name, the courts will endeavor to accommodate and reach a judicial compromise between the competing interests of: (1) the plaintiff (usually the "senior user") in protecting the good will in her or his trademark; (2) the public in being free of confusion; and (3) the defendant (usually the "junior user") in the use of her or his own family name in connection with a business. *Id.* at 332; *Taylor Wine Co., v. Bully Hill Vineyards,* 569 F.2d 731, 733–34 (2d Cir.1978).

---

**16.** The Circuit Court for the District of Columbia explained the genesis for the "sacred rights" theory in *Basile:*

A seller's right to use his family name might have carried the day against a risk of buyer confusion in an era when the role of personal and localized reputation gave the right a more exalted status.... All the Queen's subjects ...

[it has been said], have a right ... to ... sell pickles ... and not the less that their fathers have done so before them [and] that they bear the same name....

899 F.2d at 38, quoting *Burgess v. Burgess,* 3 DeG. M & G 896, 903–04, 43 Eng.Rep. 351, 354 (1853).

15. The law is "reluctant" to preclude an individual's business use of her or his own name where no attempt to confuse the public or to arrogate the goodwill of the "senior user" has been made. *Friend v. H.A. Friend and Co.*, 416 F.2d 526, 531 (9th Cir.1969); *Joseph Scott Co. v. Scott Swimming Pools, Inc.*, 764 F.2d 62, 67 (2d Cir. 1985). The problem is "more difficult when the second comer has his own background of experience in the particular industry, and is not simply a newcomer." *Bully Hill*, 569 F.2d at 733. A court must be "particularly cautious to enjoin only those uses that are likely to cause confusion, and no more," and the "ultimate aim" is to craft an injunction that will avoid confusion in the marketplace, protect the "senior user's" business interest in the name, and permit a "junior user" to "explain his [or her] identity and reputation in a legitimate manner." In fashioning the proper injunctive remedy in personal-name-as-trademark cases, the rule of *stare decisis* is somewhat limited because of the unlimited variation in fact patterns and uniqueness of circumstances. *Bully Hill*, 569 F.2d at 734.

16. In the Third Circuit, courts apply the ten factor test announced in *Scott Paper Co. v. Scott's Liquid Gold*, 589 F.2d 1225 (3d Cir.1978), to determine whether there is a likelihood of confusion of the buying public regarding the source of goods marketed by two business entities under the same or similar personal names. Those factors are:

(1) The degree of similarity between the marks;

(2) The strength of the mark;

(3) The price of the goods and other factors which suggests the care a consumer might take in making the purchase;

(4) The length of time the mark has been in use;

(5) The defendant's intent in adopting the mark;

(6) Any evidence of actual confusion;

(7) Whether the goods travel in the same channels of trade;

(8) The extent the parties target the same customers;

(9) Similarity of function in the mind of the public; and

(10) Other factors that suggest that the public would expect the plaintiff to manufacture a similar product.

17. *Application of Scott Paper Co. Test.*

(1) *Degree of similarity.* To the extent defendants identified Mrs. Robin F. Woods' personal name with the "Let's Play Dolls" line, there is obviously a high degree of similarity to the trademark "Robin Woods." However, aside from this similarity arising from promotional literature for "Let's Play Dolls," there is no similarity between "Robin Woods" and "Alice Darling," nor is Mrs. Woods' handwriting so distinctive that her signature of "Alice Darling" on postcards or on boxes associates her "Alice Darling" persona with her signature as "Robin Woods."

(2) *Strength of the mark.* Personal name trademarks are not descriptive or suggestive and acquire their value from secondary meaning. *See generally Telemed Corp. v. Tel-Med, Inc.*, 588 F.2d 213 (7th Cir.1978). The name "Robin Woods" is a strong mark in the collectible doll market and is a relatively weak mark in the play doll market, especially given the Company's emphasis on collectibility and progression toward "The Collectible Doll Company" over the past few years.

(3) *Price of goods and other factors suggesting degree of care consumer might be expected to exercise.* The price range of "Let's Play Dolls" is approximately $80.00 to $150.00, retail; the Company's collectible doll price range is much higher, typically $150.00 to $250.00, although prices run from $100.00 to $700.00. Additionally, purchasers of collectible dolls are *generally* more sophisticated than non-collector purchasers who are buying a doll primarily for children to play with every day.

(4) *Length of time.* The "Robin Woods" trademark has existed at least since the mid-1980s, "Alice Darling" since 1992 at the earliest.

(5) *Defendants' intent in "adopting" mark.* Defendants have not adopted the

mark, but merely advertised the fact that "Mrs. Robin F. Woods" would no longer be designing dolls for the Company and would be designing and promoting the "Let's Play Dolls" line of play dolls for Alexander. Their intent does not seem to have been to damage plaintiff[17] or arrogate the Company's goodwill for themselves, but was rather to develop a strategy to allow Mrs. Woods to use her considerable talents and "hard earned reputation" to design and promote dolls to compete in the play doll market, a market that was not foreclosed to Mrs. Woods by the injunction.

(6) *Evidence of actual confusion.* There was evidence of *potential* confusion as of February 7, 1992. By mid-summer of 1992 certainly, the evidence shows that there has been *no actual* confusion in the doll industry as to the source of "Robin Woods" dolls. "Robin Woods" *collectible* dolls that have been designed by Mrs. Woods are available only from the Company (as long as its inventory lasts). "Alice Darling" (who everybody in the industry knows to be Mrs. Woods) is the sole source of "Let's Play Dolls" dolls. There is no evidence that collectors are purchasing "Let's Play Dolls" dolls by mistake, seeking to add to their "Robin Woods" collection; indeed, the "Alice Darling" dolls are being purchased and, so far as can be known, used for play.

(7) *Channels of trade.* The dolls are being marketed in the same *general* channels of trade, *i.e.*, the doll market, but the similarities stop there. As the testimony of Mr. Mandeville (among others) convincingly proves, "Let's Play Dolls" are advertised, marketed and promoted *exclusively* as play dolls, and the marketing has apparently been successful in reaching the target purchaser of play dolls.

(8) *Customer targeting.* Plaintiff and defendants do not target the same retail customers. Plaintiff, the *"Collectible* Doll Company,"* targets a different, older and more sophisticated buyer of collectible dolls, while defendants target mothers and grandmothers buying "Let's *Play* Dolls" dolls for their

daughters and granddaughters to play with. While labels and nomenclature can sometimes be misleading, here they are not.

(9) *Similarity of function in the public perception.* The functions—play vs. collection—are not at all similar, although it is likely that some buyers may purchase a "Let's Play Dolls" doll for collection and that some may purchase a "Robin Woods" doll for play. That cross-over is not, however, determinative of whether a doll is "collectible" or "play."

(10) *Other miscellaneous factors to suggest the public would expect plaintiff to manufacture a similar product.* Collectors, more sophisticated and informed than non-collector doll buyers, now know that Mrs. Woods is no longer designing dolls for the Company or designing collectible dolls for anyone, and would not expect the Company to manufacture a play doll by Mrs. Woods.[18]

■ 18. Considering all of the circumstances and all of the *Scott Paper Co.* factors, there is no likelihood of confusion between the Company's business of manufacturing and selling "Robin Woods" collectible dolls, and defendants' business of manufacturing and selling play dolls in the "Let's Play Dolls" line. *Compare Scott v. Mego Int'l, Inc.,* 519 F.Supp. 1118 (D.Minn.1981) (Manufacturer/seller of "Micro Nauts" small scale precision military equipment and pieces used in the highly specialized "wargaming" hobby industry, was not entitled to injunction to prohibit defendant from manufacturing and selling "Micronauts," futuristic, space-oriented toys, despite the near identical names, because defendant's product was not designed or marketed for sophisticated "wargamers" but was, instead, targeted at children for play) *with Hasbro, Inc., v. Lanard Toys, Ltd.,* 858 F.2d 70 (2d Cir.1988) (Manufacturer/seller of "G.I.Joe" warmongering military action toy figures was entitled to injunction against defendant to prohibit it from marketing and selling its "Gung Ho" line of warmongering military action figures designed to compete with "G.I.Joe" and to

---

17. *See* Findings of Fact 12, 13.

18. The plaintiff disseminated this information in the letter of Canfield to retail specialty doll shop owners, including Ms. Hyatt and Ms. Moody.

wear "G.I.Joe's" accessories and equipment) *and Warner Bros. v. Gay Toys, Inc.,* 658 F.2d 76 (2d Cir.1981) (Manufacturer/seller of toy car called "Dixie Racer" which was in all other respects a duplicate of plaintiff's toy car, the "General Lee" prominently featured on Warner Bros.' successful television series, the "Dukes of Hazzard," could be enjoined from marketing and selling the "Dixie Racer" which caused confusion for target consumers, *i.e.,* young boys.)

19. Another nuance is introduced into this personal-name-as-trademark case in that the actual "senior user" of the trademark "Robin Woods" is the defendant, Mrs. Robin F. Woods, who has conveyed the right to use that trademark to the "junior user," the plaintiff-Company, for valuable consideration, namely a much-needed infusion of capital from the Pittsburgh Seed Fund. It is "well-settled that a person who has adopted and used his surname as a trade-mark, or trade-name may transfer the same with the good will of a business and thereby divest himself of the right to use his name in connection with such a business." *Guth v. Guth Chocolate Co.,* 224 F. 932, 933 (4th Cir.1915). The Fourth Circuit Court of Appeals refused to allow defendant to manufacture and sell chocolates under the name "Charles G. Guth" because he had sold the Guth Chocolate Co. along with the "good will and use of the name Guth," stating "what [Guth] really seeks to do is to keep for himself the essential thing he sold, and also keep the price he got for it. A court of equity may properly prevent such manifest unfairness." *Id.* at 933. In other words, Mr. Guth could not have his chocolate cake and eat it, too. *See also Levitt Corp. v. Levitt,* 593 F.2d 463 (2d Cir.1979) (William Levitt, creator and developer of the highly successful "Levittown" communities in New York and Pennsylvania, was prohibited from using his name and exploiting his personal reputation to promote and market a residential community in Florida, having sold all of the goodwill, trademarks, trade names, service marks and service names, including the registered names "Levitt" and "Levitt and Sons" and the unregistered trademark "Lev-

ittown" to ITT Corporation in exchange for ITT common stock worth $60 million, and other consideration.)

20. The circumstances of this case more closely resemble those of *Madrigal Audio Laboratories v. Cello, Ltd.,* 799 F.2d 814 (2d Cir.1986), which this Court finds particularly helpful in determining the scope of the injunction and the extent of defendants' contempt of court. In *Madrigal,* Mark Levinson, well-known designer of sophisticated high-end audio equipment, started his own company to produce and distribute his audio equipment. In need of operating capital, Levinson obtained substantial investors who insisted that he convey to Mark Levinson Audio Systems, Inc. (MLAS) the trade name "Mark Levinson" and all variations thereof.[19] Eventually, Levinson left MLAS which went into bankruptcy and sold all of its assets at public auction to Madrigal, including the trademarks and trade name. Meanwhile, Levinson had started a new company, Cello, Ltd., to manufacture and distribute high-end audio equipment to the audiophile. Cello began manufacturing its first product, an "audio palette" which is similar to an equalizer, and marketed this product as part of the "Mark Levinson" line, with promotional literature identifying Levinson as the designer by text and photograph.

21. The Second Circuit reversed and vacated the district court's injunction enjoining Cello and Levinson from generating any publicity, advertising or oral or written communication about Levinson's connection with Cello or his past connection with MLAS. The court held that a preliminary injunction was inappropriate in the absence of any evidence that the purchasers of plaintiff's or defendant's audio equipment were actually misled or confused as to the source of the equipment. 799 F.2d at 821. The court further stated:

> A name becomes a trade name and merits protection under Section 43 of the Lanham Act, 15 U.S.C. § 1125, when it acquires "secondary meaning", i.e., when the

19. Although Levinson had signed a broad non-competition employment agreement, Madrigal did not timely assert any rights under that agreement and it played no role in the court's analysis of the propriety of injunctive relief.

name comes to "symbolize a particular business ..." to consumers.... An individual's personal name can acquire, through advertising or some other means, such a "secondary meaning"; thereupon it may become a trade name.... But even when a personal name has become a trade name it continues to serve the important function to its bearer of acting as a symbol of that individual's personality, reputation and accomplishments as distinguished from that of the business, corporation or otherwise, with which he has been associated ... Accordingly, though an individual may sell the right to use his personal name ... a court will not bar him from using that name unless his "intention to convey an exclusive right to the use of [his] own name" is "clearly shown." ...

Whether a person who sells the trade name rights to his personal name is barred from using his personal name depends on the terms of the sale.... When an individual sells no more than the right to use his name as a trade name or trademark he is precluded only from using his personal name as part of that of another company or on other products.... and not from taking advantage of his individual reputation (as opposed to the reputation of the company which bore his personal name as a trade name) by establishing a company which competes against the purchaser of the trade name ... or from advertising, in a not overly intrusive manner, that he is affiliated with a new company....

799 F.2d at 822 (Citations omitted).

22. As in *Madrigal*, Mrs. Woods conveyed to the Company her right to affix the trademark "Robin Woods" and the other trademarks to any products designed for other businesses, but her agreement with the Company did not purport to preclude Mrs. Woods, upon termination, from taking advantage of her own individual reputation (as opposed to the reputation and goodwill of the Company which bears her name); neither did the injunction prohibit Mrs. Woods from all association with her given name for all time, and her name continues to serve the important function of "acting as a symbol of that individual's personality, reputation and

accomplishments," as distinguished from those of the Company. Instead, the injunction was designed to prevent the likelihood of confusion that existed *at that time* as to Mrs. Woods' affiliations and the possible dual sources in the public's perception of "Robin Woods" collectible dolls.

23. Defendants have not attempted to arrogate the goodwill of the Company, nor have they falsely designated any of their products as associated with plaintiff's. *See Madrigal*, 799 F.2d at 823–24. Moreover, the Company has no right to cloak with secrecy the fact that Mrs. Woods is no longer associated with it, nor does it possess the right to represent that it retains her services, and it would be at least misleading were the Company to make such representations to the public. (Chief Magistrate Judge's Recommendation at 23; *Madrigal*, 799 F.2d at 825, n. 5.)

## D. SANCTIONS

24. Plaintiff has not established that any of its lost sales, orders or profits were caused by defendants' post-injunction conduct or by any confusion that conduct might have caused. The record discloses several other causes of the Company's losses, especially the facts that Mrs. Woods was no longer designing or signing dolls for the Company and that the Company had made some serious customer relations/marketing blunders which soured its already overstocked former customers on the Company. Plaintiff's lay and expert witnesses were not convincing and offered very little by way of foundation as to their opinions that the Company's losses were caused by having two sources of "Robin Woods" dolls on the market. Mr. Iwanyshn, the "outside" expert witness, based his opinion as to the cause of damages ("unanticipated competition") primarily on his interviews with the "inside" experts and the "internally-generated" information the Company supplied in preparation for litigation. The foundation for such opinion evidence is inherently self-serving, and the opinion is therefore entitled to little weight. *815 Tonawanda Street Corp. v. Fay's Drug Co., Inc.*, 842 F.2d 643, 648 (2d

Cir.1988). Plaintiff has not proven it is entitled to any compensatory damages.

25. Plaintiff is, however, entitled to attorneys' fees associated *only* with the contempt litigation, and not with the proceedings on the preliminary injunction or the appeal. Attorneys' fees for the latter would be unfair because defendants had not yet begun distributing or promoting "Let's Play Dolls" and no trademark infringement had yet occurred when the injunction issued. It is not necessary that defendants' contemptuous conduct be undertaken in bad faith to justify an award of counsel fees, but only that it be willful. *Ranco Industrial Products Corp. v. Dunlap*, 776 F.2d 1135, 1139 (3d Cir.1985). There is no indication defendants acted in bad faith, and they did act on advice of counsel. However, that advice was unreasonable in light of this Court's denial on February 11, 1992, of defendants' motion for modification or stay pending appeal. Defendants' willful violation of the clear and unambiguous language of paragraphs 1(g), 5 and 8 of the injunction order prompted the motion for contempt, and warrants an award of attorneys' fees.

26. Plaintiff has submitted affidavits of counsel as to attorneys' fees and expenses connected with the preliminary injunction, its appeal and these contempt proceedings. Defendants do not dispute the reasonableness of the fees, but they dispute plaintiff's entitlement to attorneys' fees related to obtaining the preliminary injunction and its appeal, they dispute plaintiff's calculations, and they further argue "defendants should not be held responsible for the time spent by Karlowitz & Cromer to familiarize themselves with the facts of this action, as it was Robin Woods, Inc's decision to obtain new counsel." There is no suggestion plaintiff changed attorneys (as is its right) to build-up counsel fees or to delay these proceedings, and this Court disagrees with defendants that current counsel's "start-up time" should not be included in the award of attorneys' fees. However, plaintiff is not entitled to recover attorneys' fees generated in obtaining the preliminary injunction or in defending it on appeal.

As to those portions of the itemized statements of fees and expenses connected with the contempt proceedings that are in dispute and the challenged computation of a total amount, the Court will direct the parties to consult and attempt to resolve their differences by consent, and failing such resolution will schedule an evidentiary hearing upon the request of either party to resolve the issue of attorneys' fees.

27. Plaintiff also seeks approximately $107,000.00 which it claims is the cost of management's time and expense in preparing for the contempt litigation. Defendants do not dispute the amount claimed, but deny that plaintiff is legally entitled to such damages. (Defendants' Proposed Findings of Fact and Conclusions of Law, paragraphs 55 (Findings) and 20 (Conclusions)). A successful party proving contempt is entitled to recover by way of civil fine, the expense of investigating the violation of the order, preparing for and conducting the contempt proceeding, in addition to attorneys' fees. *Winterland Concessions*, 1992 WL 170897, * 10, 1992 U.S.Dist. LEXIS 9917, * 24, citing, *inter alia, Vuitton et Fils, S.A. v. Carousel Handbags*, 592 F.2d 126, 130–31 (2d Cir. 1979). This Court will award plaintiff these costs.

28. Plaintiff also requests this Court extend the two-year "non-competition agreement and the restraints imposed upon the defendants by a period equal to the time elapsed between the entry of the preliminary injunction and the imposition of the sanctions." (Proposed Findings of Fact and Conclusions of Law submitted by plaintiff, paragraph 18(i)). Although such an extension is within the range of sanctions that a court can lawfully impose upon a finding of willful contempt, extension is not appropriate in this case because defendants have not violated the agreement not to compete in the collectible doll market or the provisions of the injunction based upon that agreement. *Cf. Levitt Corp.* (Where defendant/infringer's contempt was willful and blatant and caused actual widespread confusion among consuming public as to whether plaintiffs or defendant/infringer was the developer of retirement communities, and seriously damaged the goodwill that defendant/infringer had

sold to plaintiffs, district court properly extended the restrictive period of covenant not to compete and injunction).

### E. MISCELLANEOUS

29. Defendants have filed a motion to modify this Court's Order dated February 7, 1992 (Document No. 132), and plaintiff has responded (Document No. 137). The motion requests this Court modify the injunction to permit Mrs. Woods to again use the trade name "Robin Woods" based on the initial determination by the Patent and Trademark Office denying plaintiff's application for registration of this trade name. The proper protocol would be to await the Chief Magistrate Judge's recommendation on this motion; however, in the interests of judicial economy, this Court will decide the merits of this motion, and will deny it.

 Federal registration does not create a trademark; rather, the trademark comes from use, not registration, and the right to use it is in the nature of a property right based on the common law. *Friend v. H.A. Friend,* 416 F.2d 526, 532 (9th Cir.1969). This Court's determination of February 7, 1992, has been affirmed by the Third Circuit and is the law of the case. *United States v. Local 560 Int'l. Bhd. of Teamsters,* 974 F.2d 315, 329–30 (3d Cir.1992). That determination establishes conclusively, therefore, that "Robin Woods" is a trademark or trade name as to which plaintiff now owns the rights, regardless of whether that mark has been registered.

### DENOUEMENT

Based upon the foregoing findings of fact and conclusion of law, this Court holds defendants in contempt of court for violating paragraphs 1(g), 5 and 8 only of the Order of February 7, 1992, and will impose sanctions by an appropriate Order of Court to accompany this Opinion.

### ORDER OF COURT

AND NOW, this 18th day of December, 1992, it is hereby ordered that plaintiff's Motion for Contempt, Counsel Fees, Expenses, Damages and Other Sanctions (Document No. 57) is granted in part, defendants having been found in contempt of paragraphs 1(g), 5 and 8 of this Court's Order of February 7, 1992, and sanctions are imposed against defendants as follows:

(1) Damages in the amount of $107,000 are awarded to compensate plaintiff for the costs of management time and expense in preparation for the contempt proceedings;

IT IS FURTHER ORDERED that attorneys' fees and expenses in connection with the contempt proceeding will be awarded in an amount either:

(i) To be established by consent order to be submitted by the parties on or before January 15, 1993; or

(ii) To be determined on plaintiff's affidavit(s), defendants' response and/or affidavit(s) and supporting briefs of the parties, or after hearing in the event that any party requests an evidentiary hearing on or before January 15, 1993. Plaintiff's affidavit(s) and brief shall be filed on or before January 22, 1993, and defendants' response, affidavit(s) and brief shall be filed on or before January 29, 1993.

(2) Defendants' motion to strike damage claims (Document No. 95), motions in limine to exclude certain evidence (Document Nos. 96 and 104), motion for summary judgment as to damages (Document No. 102), motion to strike plaintiff's Exhibit 104 (Document No. 120) and motion to modify this Court's Order of February 7, 1992 (Document No. 132) are denied.

EXHIBIT

# ALEXANDER DOLL COMPANY
is pleased to announce that
## MRS. ROBIN F. WOODS*

is exclusively associated with the

# LET'S PLAY DOLLS
division of the Alexander Doll Company
and will be creating dolls for play under the name

*Mrs. Woods was formerly associated with Robin Woods, Inc. (RWI). Mrs. Woods resigned from RWI in December 1991. A federal court, on February 7, 1992, preliminarily ruled that RWI owns the trade name "Robin Woods" and that Mrs. Woods may not use her name to identify any dolls which she designs. Accordi... Mi... ... ...sumed a new trade name "Alice Darling" to identify the dolls she designs for the Alexander [... ... ...]...